130 F.3d 219
 John E. ADAM, Individually and as Executor of the Estate of
Ann Adam, and Christopher Meyer, Guardian of the
Estate of Rachel E. Adam,
Plaintiffs-Appellants/Cross-Appellees,
v.
J.B. HUNT TRANSPORT, INC., and Larry F. Holbrooks,
Defendants-Appellees,
A.G. Carriers, Inc., and William H. Wood,
Defendants-Appellees/Cross-Appellants.
 Nos. 95-6680, 96-5003.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 7, 1997.
Decided Nov. 10, 1997.
Rehearing Denied Jan. 7, 1998.
 
 Leslie W. Morris, II, Stoll, Keenon & Park, Lexington, KY, Patrick H. Boggs (argued and briefed), Joseph Anthony Gerling (briefed), Lane, Alton & Horst, Columbus, OH, for Plaintiffs-Appellants/Cross-Appellees.
 Benjamin L. Kessinger, Jr. (argued and briefed), Lee Kessinger, III (briefed), Stites & Harbison, Lexington, KY, Barry M. Miller (argued and briefed), Michael E. Liska (briefed), Fowler, Measle & Bell, Lexington, KY, for Defendants-Appellees/Cross-Appellants.
 Before: KENNEDY, NELSON, and VAN GRAAFEILAND,* Circuit Judges.
 OPINION
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a diversity case that arose out of a multi-vehicle accident on an interstate highway in Lexington, Kentucky. The lawsuit was filed by or on behalf of John Adam, who suffered multiple head injuries; the estate of his wife, Ann Adam, who was killed; and the couple's six-year-old daughter, Rachel Adam, who sustained damages which a jury was to assess at $30,000.
 
 
 2
 Mr. Adam was hospitalized for ten days as a result of his injuries, and he spent the first five days of his hospitalization in an intensive care unit. Not until approximately three months had passed did he return to work. The jury nonetheless awarded Mr. Adam zero dollars as the "sum of money that will fairly and reasonably compensate him for the injuries which he has sustained...."
 
 
 3
 The plaintiffs moved for a new trial, contending, among other things, that the verdict as to Mr. Adam's damages was against the manifest weight of the evidence. The trial court denied the motion, and the plaintiffs have appealed from a judgment entered on the verdict. Certain of the defendants have cross-appealed.
 
 
 4
 We conclude that the trial court abused its discretion in declining to grant Mr. Adam a new trial on the issue of damages. Rejecting all other assignments of error--including one that pertains to the apportionment of damages against third-party defendants dismissed from the lawsuit prior to trial--we shall affirm the judgment in part and reverse it in part.
 
 
 5
 * Mr. and Mrs. Adam and their daughter, who had been on vacation, were returning to their home in Ohio at the time of the accident. The date was May 19, 1992. The Adams were traveling in a 1988 Dodge Caravan driven by Mr. Adam.
 
 
 6
 The Adam van was proceeding north on Interstate 75 in Fayette County, Kentucky. There was a film of diesel fuel over the highway, for some reason, and a light rain was falling. The road was very slick.
 
 
 7
 As might be expected, given the nature of his trauma, Mr. Adam has no recollection of the accident. There was evidence, however, that the Adam van was in the left lane when a red Toyota, driven by an unidentified driver, moved into that lane from the right; that the Adam van veered left and hit a guardrail; that the van was then struck by a Chevrolet Corsica; that an ambulance owned by Med-Tech, Inc., and driven by Roger Musick pulled off onto the right safety lane, where it was hit by a Dodge Monaco; that the Monaco spun out into the right lane of traffic; that a grey Renault came to a stop on the left berm just short of the Adam van; that a black pickup truck was moving between the ambulance on the right and the Adam van on the left when defendant J.B. Hunt's tractor-trailer rig, driven by defendant Larry Holbrooks, went into a jackknife and crashed into the Monaco, the Renault, the Adam van, and the black pickup; that Mrs. Adam was ejected from the van; and that defendant A.G. Carriers' tractor-trailer rig, which was being driven behind the Hunt rig by defendant William Wood, hit the Adam van after Mrs. Adam had been ejected.
 
 
 8
 There was also conflicting evidence--mainly presented after the completion of the plaintiffs' case in chief--from which a jury could have inferred that the Adam van hit the guardrail after the Med-Tech ambulance, entering the interstate from a ramp on the right, swerved into the van; that the A.G. Carriers tractor hit the J.B. Hunt trailer before the Hunt rig had jackknifed out of control; and that Mrs. Adam was not ejected from the van until the A.G. Carriers truck struck the Hunt truck and the van itself.
 
 
 9
 Both Mrs. Adam and the driver of the Monaco (which had been hit by yet another tractor-trailer) were killed. John Adam, who was found at the scene unconscious, was airlifted to the University of Kentucky Hospital. His daughter Rachel was taken to Humana Hospital.
 
 II
 
 10
 The present lawsuit was filed in the United States District Court for the Southern District of Ohio on May 13, 1993. Named as defendants were J.B. Hunt and its driver, Larry Holbrooks; A.G. Carriers and its driver, William Wood; Chrysler Corporation, the manufacturer of the van; Robert Barthelme, the driver of the Chevrolet Corsica;[1] and two John Doe defendants. In due course the case was transferred to the Eastern District of Kentucky under 28 U.S.C. § 1406. Defendants J.B. Hunt and Holbrooks then impleaded various third-party defendants, including Mr. Barthelme, Med-Tech, and the ambulance driver, Mr. Musick. (The third-party defendants were subsequently dismissed, pursuant to Kentucky law, as having no liability to the original defendants for any part of the plaintiffs' claims against those defendants; see Kentucky C.R. 14.01, governing third-party practice against "a person not a party to the action who is or may be liable to [the defendant] for all or part of the plaintiff's claim against him.")
 
 
 11
 In his capacity as Executor of the Estate of Ann Adam, Mr. Adam moved for a declaration that the determination of damages on the estate's wrongful death claim should be governed by Ohio Rev.Code § 2125.02, which is part of the Ohio Wrongful Death Act. A magistrate judge, given plenary power over the case by agreement of the parties, denied Mr. Adam's motion. The magistrate held that the substantive law of Kentucky, where the accident occurred, governed the wrongful death claim.
 
 
 12
 A.G. Carriers and its driver, Mr. Wood, moved for summary judgment on the ground that there was no proof that their conduct was the proximate cause of either Mrs. Adam's death or the injuries suffered by Mr. Adam and Rachel Adam. The magistrate deferred a ruling on this motion until the case was tried.
 
 
 13
 Chrysler Corporation was dismissed pursuant to a settlement agreement, after which the case went to trial before a jury. The trial lasted almost three weeks.
 
 
 14
 At the conclusion of the plaintiffs' evidence on liability, the A.G. Carriers/Wood defendants renewed their summary judgment motion and moved in the alternative for judgment as a matter of law under Rule 50(a), Fed.R.Civ.P. The court denied the motions insofar as the personal injury claims of Mr. Adam and Rachel were concerned, but directed a verdict in favor of A.G. Carriers and Mr. Wood on the wrongful death claim. (Counsel for J.B. Hunt did not oppose the directed verdict, but asked the court to reserve its ruling on apportionment of damages until the defendants' proofs had been presented. The court agreed to do so.) The directed verdict on the wrongful death claim has not been appealed.
 
 
 15
 At the conclusion of all the evidence the case was submitted to the jury with instructions that the amount of each plaintiff's damages should be ascertained without regard to fault. (As we shall see, this instruction was consistent with Kentucky's comparative negligence statute, Ky.Rev.Stat. 411.182.) The jury was then told that fault should be apportioned among Mr. Adam, Mrs. Adam, the unknown driver of the red Toyota (John Doe # 2), J.B. Hunt and Mr. Holbrooks, A.G. Carriers and Mr. Wood,[2] and the third-party defendants that had been dismissed prior to trial. The plaintiffs objected--unsuccessfully--that the statute did not permit allocation of fault to the dismissed third-party defendants or to John Doe # 2. The objection did not extend to the inclusion of A.G. Carriers and Mr. Wood in the apportionment instructions.
 
 
 16
 The jury--which at one point in its deliberations told the court it was deadlocked (a situation that resolved itself after the court, without objection, gave an Allen charge)--set the damages of Mrs. Adam's estate at $439,226. As indicated above, Rachel's damages were set at $30,000 and Mr. Adam's at zero. The jury apportioned fault as follows with respect to the wrongful death claim:
 
 
 17
 Mr. Adam 25 percent
 Mrs. Adam 10 percent
 J.B. Hunt/Holbrooks 20 percent
 Med"Tech/Musick 25 percent
 A.G. Carriers/Wood 20 percent.
 
 
 18
 Fault was apportioned as follows with respect to the personal injury claims of Mr. Adam and young Rachel Adam:
 
 
 19
 Mr. Adam 25 percent
 J.B. Hunt/Holbrooks 25 percent
 Med"Tech/Musick 25 percent
 A.G. Carriers/Wood 25 percent.
 
 
 20
 No fault was assigned to the drivers of the red Toyota, the Chevrolet Corsica, or the Dodge Monaco insofar as any of the claims was concerned.
 
 
 21
 Judgment was entered in accordance with the verdict, subject to the qualification that the estate of Mrs. Adam took nothing against A.G. Carriers or Mr. Wood, the latters' motion for a directed verdict having been granted as to the wrongful death claim, and none of the plaintiffs took anything from Med-Tech/Musick, these third-party defendants having been dismissed by the court prior to trial without having been sued by the plaintiffs.
 
 
 22
 The plaintiffs promptly moved for a new trial on the grounds that (a) the jury had returned a compromise verdict and (b) the following findings of the jury were against the clear weight of the evidence:
 
 
 23
 -- that Mr. Adam's injuries were not compensable, and
 
 
 24
 -- that the fault of J.B. Hunt and its driver, on the one hand, and of A.G. Carriers and its driver, on the other hand, contributed in equal degree to the death of Mrs. Adam and to the injuries of Mr. Adam and Rachel.
 
 
 25
 In an opinion and order filed on November 6, 1995, the magistrate judge denied the plaintiffs' motion in all respects. The plaintiffs subsequently perfected a timely appeal, and A.G. Carriers and Mr. Wood have cross-appealed.
 
 III
 
 26
 Whether the plaintiffs are entitled to a new trial "is determined with reference to federal procedural law." Porter v. Lima Memorial Hosp., 995 F.2d 629, 635 (6th Cir.1993). We review the denial of a new trial for abuse of discretion; the decision of the trial court will be reversed only if we are left with " 'a definite and firm conviction that the trial court committed a clear error of judgment.' " Id. (quoting Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989)). The record in the case at bar leaves us with such a conviction insofar as two aspects of Mr. Adam's claim for damages are concerned, but not otherwise.
 
 
 27
 * We turn first to the issue of compensation for Mr. Adam's pain and suffering. There was uncontested evidence that Mr. Adam was found at the scene of the accident unconscious and bleeding profusely from multiple lacerations of the head. In the words of the emergency medical technician who attended him, Mr. Adam was "in very serious trouble." Taken by air to the hospital, Mr. Adam was placed in intensive care because of a closed head injury that had decreased his brain function level and required close monitoring. A CT scan revealed anatomic injury to the left parietal area of the brain. When he was discharged from the hospital ten days after admission, it was noted that Mr. Adam still appeared "somewhat confused."
 
 
 28
 Mr. Adam missed approximately three months from work, and, on the recommendation of his physicians, he underwent physical therapy and speech therapy. His supervisor at work, who visited him during his recuperation, testified that Mr. Adam "moved very slowly, very awkwardly," and "had a lot of trouble speaking." A co-worker testified that Mr. Adam did not even know how to tie his shoes.
 
 
 29
 When Mr. Adam finally returned to his job, according to the evidence, it took him longer than usual to complete a simple assignment. He also made more mistakes than usual. A Dr. Bain testified that the closed head injury had resulted in permanent cognitive, neurobehavior, and motor function deficits, including problem solving and divided attention deficiencies.
 
 
 30
 The parties stipulated that Mr. Adam's reasonable and necessary medical expenses came to $14,646.32. This figure was not provided to the jury. The medical records themselves were received in evidence, however, and the jury was told that there was a stipulation as to the claim for medical expenses. Any recovery on that claim, the jury was instructed,
 
 
 31
 "will be based on your determination of the parties' respective fault. Therefore, it will not be necessary for you to make any determination regarding the amounts of these [medical expense] damages."
 
 
 32
 Under Kentucky law, "a plaintiff who recovers the medical expenses incurred in treating an injury is also entitled to damages for the pain and suffering which accompany the injury." McVey v. Berman, 836 S.W.2d 445, 449 (Ky.App.1992). The magistrate nonetheless concluded that Mr. Adam had failed to establish any damages for pain and suffering because his failure to present the jury with evidence as to the dollar amount of his medical expenses "[left] the jury to speculate as to the seriousness of his physical injuries." With respect, we disagree.
 
 
 33
 It has long been recognized in Kentucky that "where a substantial personal injury is sustained, suffering is presumed and need not be proven." Schriewer v. Schworer, 296 Ky. 749, 750, 178 S.W.2d 598, 599 (1944). Here the defendants conceded that Mr. Adam had suffered a significant injury,[3] and no rational jury could have found he was uninjured. Cf. Hazelwood v. Beauchamp, 766 S.W.2d 439, 441 (Ky.App.1989) (a jury is "not free to disregard the uncontroverted evidence of the nature of the accident itself and the medical procedures performed").
 
 
 34
 The fact that the jury did not know the dollar amount of the medical expenses meant only that the jury would have been engaging in speculation had it attempted to say what the expenses came to; the jury was not left to speculate as to the seriousness of the injuries per se. The record contains ample evidence as to how seriously Mr. Adam had been injured, and in our view the finding that no compensable injury had been established was clearly against the weight of the evidence. We are satisfied that the trial court abused its discretion in holding otherwise.
 
 
 35
 The jury found separately that an award of zero dollars would fairly and reasonably compensate Mr. Adam for "[i]ncome lost during such time as it was necessary for him to be off work." The magistrate concluded--and the defendants argue on appeal--that this was a permissible finding because the jury could have determined that no part of the alleged wage loss ($9,942.31) was caused by the accident. Again we disagree.
 
 
 36
 "[E]ven though [Mr. Adam] did not return to work for about nine weeks following his ten-day stay in the hospital," the magistrate observed, "there was no medical evidence that John Adam could not return to work upon his release from the hospital." But Mr. Adam testified that he was not even capable of caring for his daughter while he was off work, adding that "[f]or the first few months I could barely stay awake." Two of Mr. Adam's co-workers testified, on the basis of what they had observed while visiting him during his recuperation, that he was not physically or mentally able to return to work. The jury was not required to accept any of this testimony at face value, of course, but to suppose that there was no necessity for Mr. Adam to miss so much as a day of work would be absurd. He obviously could not work while in the hospital, for one thing, and he was obviously in the hospital as a direct result of the accident.[4]
 
 
 37
 It is true, as some of the defendants have submitted on the strength of Cooper v. Fultz, 812 S.W.2d 497 (Ky.1991), that a "zero verdict" is not necessarily impermissible under Kentucky law. The defendants fail to note, however, that the Supreme Court of Kentucky remanded the Cooper case for a determination as to "whether '-0-' is adequate for pain and suffering considering the evidence heard by the jury." Id. at 502. In the case at bar it is abundantly clear from the evidence that "-0-" is not adequate for Mr. Adam's pain and suffering and for the time which he necessarily lost from work.
 
 B
 
 38
 As we have seen, the jury apportioned fault equally between the J.B. Hunt defendants and the A.G. Carriers defendants; 20 percent of the blame for Ann Adam's death was assigned to each pair of defendants, and 25 percent of the blame was assigned to each pair for the personal injuries of John Adam and his daughter. The plaintiffs argue both that an equal apportionment was against the weight of the evidence and that the apportionment was contrary to law insofar as the wrongful death claim was concerned. We address each argument in turn.
 
 
 39
 * The plaintiffs interpret the evidence as showing that the J.B. Hunt truck struck the Adam van, causing most or all of the damage, before any impact with the A.G. Carriers truck. The latter impact, the plaintiffs say, was merely "casual." This is certainly a permissible interpretation, and it may well be the more reasonable one. Another interpretation is possible, however, and we do not consider it an unreasonable one.
 
 
 40
 The alternative scenario, based in part on the testimony of an accident reconstruction expert named Sayre, is that the J.B. Hunt rig was not yet totally out of control, and had not yet collided with the Adam van, when it was sent into a complete jackknife as a result of having been hit in the rear by the A.G. Carriers truck; that the Carriers truck slammed into the left front of the Adam van, causing significant damage; and that the Adam van was propelled a significant distance down the highway by the combined force of the two trucks, or perhaps by the A.G. Carriers truck alone. Mr. Sayre was unwilling to rule out the possibility that Mrs. Adam was ejected from the van upon impact with the A.G. Carriers truck.
 
 
 41
 The magistrate, who was intimately familiar with all of the evidence, concluded that the jury was entitled to resolve the conflict in the manner it did. We have no definite and firm conviction that the magistrate was wrong in this conclusion.
 
 2
 
 42
 The trial court, it will be recalled, granted the motion of the A.G. Carriers defendants for a directed verdict with respect to the wrongful death claim. Notwithstanding that some of the evidence introduced subsequent to the granting of this motion tended to implicate the A.G. Carriers defendants in Mrs. Adam's death, the estate argues that it was legal error to include the A.G. Carriers defendants in the instructions on allocation of fault. Relying in part on a dictum in Baker v. Webb, 883 S.W.2d 898, 899 (Ky.App.1994), where a Kentucky court of appeals remarked that third-party defendants become subject to apportionment of fault under Ky.Rev.Stat. 411.182 "if such persons are not properly dismissed," Mrs. Adam's estate contends that a defendant who has been properly dismissed is not a "party" to whom the apportionment statute can apply.
 
 
 43
 Although the plaintiffs made a timely objection to including the third-party defendants and John Doe # 2 in the apportionment instructions, no such objection was raised with respect to the inclusion of A.G. Carriers and Mr. Wood. The assignment as error of the inclusion of the A.G. Carriers defendants in the apportionment instructions is therefore prohibited by Rule 51, Fed.R.Civ.P., and the verdict returned in accordance with the instructions can be reversed only for plain error. See Preferred Rx, Inc. v. American Prescription Plan, Inc., 46 F.3d 535, 548 (6th Cir.1995).
 
 
 44
 Given the state of the record when this case went to the jury--i.e., given that there was evidence which the jury could and did interpret as implicating the A.G. Carriers defendants in Mrs. Adam's death--and given the state of Kentucky's caselaw under the apportionment statute (a subject to which we shall turn in Part IV of this opinion), we find no error, plain or otherwise, in the allocation of a degree of fault to A.G. Carriers and its driver.
 
 C
 
 45
 Relying heavily on Skinner v. Total Petroleum, Inc., 859 F.2d 1439 (10th Cir.1988), the plaintiffs argue that the trial court abused its discretion in rejecting their claim that a new trial was necessitated as to all issues because the verdict was the result of a compromise. We do not find the argument persuasive.
 
 
 46
 It is true that the damages awarded to Mr. Adam were inadequate. But as the Kentucky Supreme Court observed in Nolan v. Spears, 432 S.W.2d 425, 428 (Ky.1968), "[t]he appellant-plaintiff who is given a new trial because of inadequacy of damages does not receive it because the verdict was reached by compromise, but because the verdict does not conform in its terms to the law and the evidence." And in the case at bar, as the magistrate pointed out, "[t]he jury awarded maximum damages [i.e., the maximum permitted under the Kentucky Wrongful Death Statute] to the Estate of Ann Adam and awarded significant damages to Rachel Adam; thus, two of the three Plaintiffs were awarded substantial damages."
 
 
 47
 The fact that the jury reported a deadlock at one point in its deliberations is not determinative. The trial of this case was a long and complex one, and it is not particularly surprising that the jury should have had difficulty in reaching a verdict. The significance of a temporary deadlock always depends on the particular circumstances of the case--and on the facts before us here, we see no compelling indication of an impermissible jury compromise.
 
 
 48
 The facts of Skinner bear only a superficial resemblance to the facts of the case at bar, and the Tenth Circuit's opinion in Skinner does not indicate that the court saw any particular reason to focus on the difference between directing the trial court to grant a new trial because the jury's damage award was too low and directing the trial court to grant a new trial because of a compromise verdict. If the Skinner court had been faced with the record confronting us here, we suspect that the court would have done just what we are doing--that is, it would have directed the trial court to grant Mr. Adam a new trial on the issue of his damages.
 
 IV
 
 49
 We turn next to the plaintiffs' contention that the third-party defendants (who had been dismissed prior to trial) and John Doe # 2 (who had never been identified or served with process) should not have been included in the instructions given the jury with regard to the allocation of fault. The plaintiffs' claim of error in this regard was preserved, as we have said, by a timely objection at trial.
 
 
 50
 Kentucky's comparative negligence statute, which became effective on July 15, 1988, provides in relevant part as follows:
 
 
 51
 "(1) In all tort actions ... involving fault of more than one party to the action, including third-party defendants and persons who have been released [under settlement agreements] ... the court ... shall instruct the jury to answer interrogatories ... indicating:
 
 
 52
 (a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
 
 
 53
 (b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability...." Ky.Rev.Stat. 411.182.
 
 
 54
 The plaintiffs maintain that John Doe # 2 never became a "party to the action" within the meaning of this statute. They further maintain that the third-party defendants, although parties prior to trial, should not have been listed in the jury instructions as parties to whom fault could be allocated, their status as active parties having been terminated before the case was submitted to the jury.
 
 
 55
 As to John Doe # 2, the issue is moot. The jury found that no degree of fault was attributable to him as the driver of the red Toyota, and we thus have no occasion to express an opinion as to what course of action would have been required if the jury had found him partly to blame for the plaintiffs' damages.
 
 
 56
 With respect to one of the third-party defendants--the administrator of the estate of the driver of the Dodge Monaco--the issue is also moot. The jury assigned no part of the blame to this party either.[5]
 
 
 57
 A live controversy is presented with respect to Med-Tech, Inc., and Roger Musick, the driver of the Med-Tech ambulance. Because the jury allocated a percentage of the blame for the plaintiffs' damages to Med-Tech/Musick, we must decide whether the dismissal of these third-party defendants prior to trial on grounds independent of their liability to the plaintiffs precluded any apportionment of fault to them under Ky.Rev.Stat. 411.182.
 
 
 58
 In arguing that this question should be answered in the affirmative, the plaintiffs again point to the dictum in Baker v. Webb which suggests that non-settling parties who have been properly dismissed are not subject to apportionment of fault. The plaintiffs also refer to a passage in Baker v. Webb where the Kentucky Court of Appeals observed that"the thrust of KRS 411.182, considered in its entirety, limits allocation of fault to those who actively assert claims, offensively or defensively, as parties in the litigation or who have settled by release or agreement. When the statute states that the trier-of-fact shall consider the conduct of 'each party at fault,' such phrase means those parties complying with the statute as named parties to the litigation and those who have settled prior to litigation, not the world at large." Baker, 883 S.W.2d at 900 (emphasis supplied).
 
 
 59
 The third-party defendants in the case at bar, the plaintiffs suggest, were not "actively" asserting defensive "claims," as parties to the litigation, when the case went to the jury.
 
 
 60
 Baker v. Webb is clearly of interest, but like the decision on which it principally relies, Bass v. Williams, 839 S.W.2d 559 (Ky.App.1992), it is not directly in point here. In neither Baker nor Bass had the non-party who was included in the trial court's apportionment instructions ever been impleaded as a third-party defendant. As the court of appeals emphasized in Bass, "Ralph Bass [the non-party] was never sued by either Betty Bass [the plaintiff] or Geraldine Williams [the defendant] in any way, shape, fashion or form." Bass, 839 S.W.2d at 561.
 
 
 61
 Med-Tech and Musick, in contrast, clearly had been sued. Once they had been impleaded by the defendants, and at least until they were dismissed as having no liability to the defendants for any part of the plaintiffs' claims against the defendants,[6] Med-Tech and Musick were just as much "part[ies] to the action," within the meaning of Ky.Rev.Stat. 411.182, as any original party was. And a 1992 Kentucky Court of Appeals decision, Kevin Tucker & Assoc., Inc. v. Scott & Ritter, Inc., 842 S.W.2d 873 (Ky.App.1992), provides rather direct support for the proposition, urged upon us by the J.B. Hunt and A.G. Carriers defendants, that the dismissal of Med-Tech and Musick as third-party defendants did not preclude their being included in the jury instructions on apportionment.
 
 
 62
 The plaintiff in Tucker was a city that had become dissatisfied with a newly-constructed municipal golf course. The city sued its architectural firm (Tucker) for negligence and breach of contract. Tucker impleaded the general contractor (Scott & Ritter) as a third-party defendant under Kentucky CR 14. Scott & Ritter moved for dismissal on the basis that there was no way it could possibly be held liable to defendant Tucker. The trial court granted the motion, and the court of appeals affirmed the dismissal on the grounds that there was no allegation that Tucker had contracted to assume liability for Scott & Ritter and "Tucker is not entitled to contribution from Scott & Ritter [with respect to the city's tort claim], because Tucker's liability in tort is limited to those damages caused by Tucker." Id. at 874. In a footnote, the court of appeals went on to explain that
 
 
 63
 "[T]hird-party defendants may often be entitled to dismissal on the grounds that they cannot be liable to the third-party plaintiff. Cf. CR 14.01 (defendant may bring in one who may be liable to him for all or part of the plaintiff's claim). This does not mean that defendants should not assert these third-party claims; for if there is never an 'active assertion of a claim' against the third-party, liability cannot be apportioned to him.
 
 
 64
 * * * * * *
 
 
 65
 Of course, if the third-party plaintiff's claim is dismissed, the plaintiff may ordinarily amend his complaint to make the ex-third-party defendant a defendant." Id. at n. 5 (citations omitted, emphasis supplied).
 
 
 66
 Implicit in the court's footnote is an understanding that if there has ever been an active assertion of a claim against the third party--if the third party has been impleaded by the original defendant, in other words--liability can be apportioned to the third-party defendant notwithstanding a dismissal prior to trial. This understanding is made explicit in the final passage of the court's opinion:"[I]f the evidence at trial shows that Scott & Ritter caused some portion of the City's damages, Tucker will be entitled to an apportionment instruction. Scott & Ritter is entitled to be dismissed, however, because they cannot be liable to Tucker under any circumstances." Tucker, 842 S.W.2d at 875 (emphasis supplied).
 
 
 67
 The applicability to the case at bar of the passage last quoted is obvious:
 
 
 68
 "[I]f the evidence at trial shows that [Med-Tech and Musick] caused some portion of the [Adams'] damages, [the J.B. Hunt and A.G. Carriers defendants] will be entitled to an apportionment instruction. [Med-Tech and Musick are] entitled to be dismissed, however, because they cannot be liable to [Hunt/Carriers] under any circumstances."
 
 
 69
 The plaintiffs assert that the Tucker opinion is not to be cited as authority in the courts of Kentucky. In this connection the plaintiffs attach as an exhibit to their reply brief a LEXIS printout of the opinion with the following legend prominently displayed beneath the caption:
 
 
 70
 "NOTICE: THIS OPINION IS NOT FINAL AND SHALL NOT BE CITED AS AUTHORITY IN ANY COURTS OF THE COMMONWEALTH OF KENTUCKY."
 
 
 71
 We gather that the opinion is final and citable now, however, both because it has been published in the bound volume of 842 S.W.2d without any "not final" notice and because the notice has been stricken from the LEXIS data base.
 
 
 72
 Tucker was cited to the court of appeals in Baker v. Webb, moreover, and the court gave no indication that it considered the citation improper. See Baker, 883 S.W.2d at 900. In addition to rejecting a contention that Tucker had overruled Bass, indeed, the Baker court distinguished Tucker on grounds that cannot give much comfort to the plaintiffs in the instant case:
 
 
 73
 "unlike the facts in Bass [and, we would add, unlike the facts in Baker itself], CR 14.01 was used to bring into the litigation Scott & Ritter, Inc. as a party who was not originally sued. KRS 411.182 was complied with, although Scott & Ritter, Inc. was subsequently dismissed." Id. (emphasis supplied).
 
 
 74
 Ky.Rev.Stat. 411.182 was similarly "complied with" in the case at bar, although Med-Tech and Musick were subsequently dismissed without an adjudication of their liability to the plaintiffs.
 
 
 75
 The plaintiffs argue, finally, that it is "manifestly unjust" to let fault be allocated to dismissed third-party defendants. "When a jury is allowed to ascribe fault to a party who is not in court to contest that finding of fault," the plaintiffs go on to say, "the entire integrity of the trial is undermined."
 
 
 76
 A sufficient answer to this argument, we believe, is the one given by the court of appeals in Tucker:
 
 
 77
 "Of course, if the third-party plaintiff's claim is dismissed, the plaintiff may ordinarily amend his complaint to make the ex-third-party defendant a defendant." Tucker, 842 S.W.2d at 874 n. 5.
 
 
 78
 When the defendants' third-party claims against Med-Tech and Musick were dismissed by the magistrate in the case at bar, the plaintiffs could "[o]f course" have moved for leave to amend their complaint to make Med-Tech and Musick parties defendant. Had such a motion been granted--and we know of no reason to doubt that it would have been granted--Med-Tech and Musick would have been in court to contest their liability to the plaintiffs, and the integrity of the trial would have been unimpeachable. The plaintiffs having made no attempt to join the ex-third-party defendants in the proceedings before the trial court, it does not seem to us that the plaintiffs should be heard to complain here of any injustice in permitting the assignment of a measure of fault to these parties.
 
 
 79
 If Kentucky were to adopt a rule contrary to the one articulated in Tucker, a plaintiff could subject deep-pocket defendants to liability for more than their fair share of the plaintiff's damages by the simple expedient of ignoring third-party defendants whose pockets might not measure up. Such a result would be difficult to reconcile with Kentucky's strong policy of attributing liability in proportion to fault. See Dix & Assoc. Pipeline Contractors, Inc. v. Key, 799 S.W.2d 24, 27 (Ky.1990) (apportionment of fault among defendants is "premised upon the principle of fundamental fairness, that liability should be assessed in relation to fault and that the extent of liability should be determined by the extent of the fault"); Floyd v. Carlisle Construction Co., Inc., 758 S.W.2d 430, 432 (Ky.1988) ("simple fairness" requires liability to be assigned in direct proportion to fault); Prudential Life Ins. Co. v. Moody, 696 S.W.2d 503 (Ky.1985) (defendant who had been dismissed on statute of limitations grounds could be included in apportionment instructions because it would be unjust to hold the remaining defendant liable for more than his share of fault).
 
 V
 
 80
 The magistrate did not err in holding that the amount of damages recoverable by Mrs. Adam's estate was governed by the law of the state where the accident occurred. The estate would have preferred to have damages determined under the law of the decedent's residence, because the Ohio Wrongful Death Statute permits the recovery of damages for non-economic injuries; the Kentucky statute, Ky.Rev.Stat. 411.130, does not. We are satisfied, however, that the magistrate was correct in applying the Kentucky statute.
 
 
 81
 The plaintiffs do not dispute the proposition that the choice-of-law rules to which the trial court was required to look were Kentucky's, not Ohio's. If this diversity case, filed originally in an Ohio district court, had been transferred to the Kentucky district court pursuant to 28 U.S.C. § 1404(a), the transferee court would have been required to apply Ohio's choice-of-law rules. See Ferens v. John Deere Co., 494 U.S. 516, 523, 110 S.Ct. 1274, 1279-80, 108 L.Ed.2d 443 (1990). Because the case was transferred pursuant to 28 U.S.C. § 1406(a), however, the transferee court was required to apply the choice-of-law rules that would have been applicable had the action been commenced in that court. See Schaeffer v. Village of Ossining, 58 F.3d 48, 50 (2d Cir.1995). Under Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), it is the choice-of-law rules of the forum state--Kentucky, in this instance--that control.
 
 
 82
 Prior to 1967, Kentucky followed the familiar lex loci delicto rule under which tort actions were held to be governed by the substantive law of the jurisdiction where the tort occurred. See, e.g., Ansback v. Greenberg, 256 S.W.2d 1 (Ky.1952). Then in Wessling v. Paris, 417 S.W.2d 259, 260-61 (Ky.1967), where a plaintiff and defendant who both lived in Kentucky were involved in an automobile accident in Indiana, the Kentucky court decided that the lex loci rule should not always apply, and that in "a very clear case," at least, Kentucky's substantive law could be applied to an outof-state accident on the basis of the "most significant contacts" theory.
 
 
 83
 A year later, in Arnett v. Thompson, 433 S.W.2d 109 (Ky.1968), the Kentucky court upheld the application of Kentucky law in a suit between two Ohio residents who had been involved in a automobile accident in Kentucky. The "conflicts question should not be determined on the basis of a weighing of interests," the court declared, "but simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law." Id. at 113. The court went on to hold that "if the accident occurs in Kentucky ... there is enough contact from that fact alone to justify applying Kentucky law." Id.
 
 
 84
 Kentucky's high court has denied that Wessling and Arnett mean that Kentucky applies a "most significant contacts" rule to Kentucky residents involved in out-of-state accidents and an "enough contacts" rule for out-of-state residents involved in accidents in Kentucky. See Foster v. Leggett, 484 S.W.2d 827, 829 (Ky.1972). But Kentucky does take the position that when a Kentucky court has jurisdiction over the parties,
 
 
 85
 "[the court's] primary responsibility is to follow its own substantive law. The basic law is the law of the forum, which should not be displaced without valid reasons." Foster, op. cit.
 
 
 86
 In other words, "if there are significant contacts--not necessarily the most significant contacts--with Kentucky, the Kentucky law should be applied." Id.
 
 
 87
 Citing Wessling, Arnett and Foster, our own court had occasion to observe in Harris Corp. v. Comair, Inc., 712 F.2d 1069, 1071 (6th Cir.1983), that "Kentucky courts have apparently applied Kentucky substantive law whenever possible." This was no exaggeration. Indeed, two of the three judges who dissented in Foster went so far as to say that Foster "opens Kentucky as a forum which will instantly apply its own law upon any excuse whatever, regardless of policy considerations of sister states to the contrary." Foster, 484 S.W.2d at 831 (Reed, J., dissenting, joined by Milliken, J.)
 
 
 88
 Be that as it may, Kentucky obviously had "significant" contacts in Foster, although "not necessarily the most significant contacts," and this was held to require the application of Kentucky law. Id. at 829. In Arnett, as the Foster majority noted, the court "held the fact that the accident occurred in Kentucky was, standing alone, enough contact to justify the application of the law of Kentucky." Foster, 484 S.W.2d at 829. Foster certainly did not backtrack from Arnett in this regard. The lesson for us, then, is clear: because the Adams' accident occurred in Kentucky, a Kentucky court--and the United States District Court for the Eastern District of Kentucky is the functional equivalent of a Kentucky court in this diversity case--"should" apply Kentucky law on the facts presented. See Foster, 484 S.W.2d at 829.
 
 VI
 
 89
 Finally, we come to the cross-appeal of the A.G. Carriers defendants. The only issue properly before us in this regard is whether the evidence presented at trial was sufficient to warrant submitting the case against A.G. Carriers and its driver to the jury. We are foreclosed from deciding whether, on the record as it existed prior to trial, the magistrate ought to have granted summary judgment to these defendants. Normally, at least, once there has been a jury verdict adverse to the moving party, the denial of the summary judgment motion "is 'not properly reviewable on an appeal from the final judgment entered after trial.' " Jarrett v. Epperly, 896 F.2d 1013, 1016 (6th Cir.1990) (quoting Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358 (9th Cir.1987)). Although it may be unjust to deny a summary judgment motion improperly, " 'it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial.' " Id. at 1016 n. 1 (quoting Locricchio, 833 F.2d at 1359).
 
 
 90
 After the plaintiffs' evidence had been fully presented in the case at bar, as we have seen, the A.G. Carriers defendants moved unsuccessfully for judgment as a matter of law. In considering the propriety of the magistrate's ruling on this issue, we are constrained to use the same standard that a court of the forum state would apply under that state's law. See K & T Enterprises, Inc. v. Zurich Ins. Co., 97 F.3d 171, 176 (6th Cir.1996).
 
 
 91
 Under Kentucky law, a motion for a directed verdict--the same thing as a motion for judgment as a matter of law under Rule 50, Fed.R.Civ.P.--should be granted only if "there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." Washington v. Goodman, 830 S.W.2d 398, 400 (Ky.App.1992). In deciding such a question, "every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made." Baylis v. Lourdes Hosp., Inc., 805 S.W.2d 122, 125 (Ky.1991).
 
 
 92
 Under the Kentucky standard, we are satisfied that the A.G. Carriers defendants were not entitled to judgment as a matter of law. Considering the trial record as a whole, we believe that reasonable minds could differ as to whether the A.G. Carriers truck was following the J.B. Hunt truck too closely and struck the rear of that truck, causing it to jackknife prior to the impact with the Adam van. There was not a complete absence of proof that some of the blame for the injuries of Mr. Adam and his daughter lay with the A.G. Carrier defendants, whose truck admittedly struck the Adam van (with Mr. Adam and his daughter inside) whether or not it struck the J.B. Hunt truck first.
 
 VII
 
 93
 The judgment is REVERSED insofar as it fails to provide for the recovery of damages by plaintiff John E. Adam for his pain and suffering and lost time from work, and the case is REMANDED for a new trial on the extent of Mr. Adam's damages in this connection. Paragraph 13 of the judgment, dealing with the assessment of costs as to Mr. Adam's personal injury claims, is VACATED. In all other respects the judgment is AFFIRMED.
 
 
 
 *
 The Honorable Ellsworth A. Van Graafeiland, United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 The plaintiffs settled their claims against Mr. Barthelme at an early stage of the proceedings, and Barthelme was dismissed voluntarily
 
 
 [2]
 The magistrate explained to counsel that he was "putting A.G. Carriers back in the [m]ix on Ann Adam's death," notwithstanding the directed verdict on liability, because of subsequent evidence indicating "that [the] A.G. Carriers truck rear ended [the] J.B. Hunt truck and caused it to jackknife prior to the impact with the van."
 
 
 [3]
 J.B. Hunt arranged to have Mr. Adam examined by a neurologist of its choosing, but elected not to call the neurologist as a witness at trial
 
 
 [4]
 In another separate finding the jury determined that Mr. Adam had failed to establish any permanent impairment of his ability to earn money. In allowing this determination to stand, the magistrate pointed out that once Mr. Adam returned to work he lost no further time as a result of the accident; that his salary went up following the accident; and that he "introduced no evidence that his ability to earn a living had been permanently impaired...." We find nothing in the record to contradict these observations, and we are satisfied that the magistrate did not abuse his discretion in regard to the issue of permanent impairment of earning capacity
 
 
 [5]
 Mr. Barthelme, the driver of the Chevrolet Corsica, was likewise included in the apportionment instruction and was assigned no part of the blame by the jury. The plaintiffs had released Barthelme under a settlement agreement, however, and they acknowledge that his inclusion in the apportionment instructions was therefore proper
 
 
 [6]
 If Med-Tech and Musick had been properly dismissed on the ground that there was no evidence to support a finding that they were liable to the plaintiffs, as opposed to the defendants, it would doubtless have been error to include them in the apportionment instructions. See Baker, 883 S.W.2d at 899