RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0370p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ESTATE OF KENNETH STEWART RIDDLE, by and
through its Co-Administrators, Saskia Jolene Riddle
and Kenneth Stewart Riddle, Jr., SASKIA JOLENE
RIDDLE and KENNETH STEWART RIDDLE, JR.,
Individually,

          *Plaintiffs-Appellees/*
          *Cross-Appellants,*

      *v.*

SOUTHERN FARM BUREAU LIFE INSURANCE
COMPANY,

          *Defendant-Appellant/*
          *Cross-Appellee.*

Nos. 02-6461; 03-5083

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 99-00114—Joseph H. McKinley, Jr., District Judge.

Argued: April 21, 2004

Decided and Filed: August 26, 2005

Before: RYAN, DAUGHTREY, and CLAY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Wayne J. Carroll, MACKENZIE & PEDEN, Louisville, Kentucky, for Appellant.
Michael L. Harris, HARRIS & HARRIS, Columbia, Kentucky, for Appellees. **ON BRIEF:** Wayne
J. Carroll, MACKENZIE & PEDEN, Louisville, Kentucky, for Appellant. Michael L. Harris,
HARRIS & HARRIS, Columbia, Kentucky, for Appellees.

     RYAN, J., delivered the opinion of the court, in which CLAY, J., joined. DAUGHTREY,
J. (pp. 11-16), delivered a separate dissenting opinion.

_____

**OPINION**

_____

RYAN, Circuit Judge.  This is a diversity action under Kentucky law in which the district court entered judgment in favor of the plaintiffs after a jury found that the defendant had reviewed the decedent's life insurance application in bad faith.  The defendant, Southern Farm Bureau Life Insurance Company, offers two reasons why we should reverse the judgment of the district court.  It argues, first, that the district court erred as a matter of law in holding that a finding of bad faith on the part of the defendant, without more, is sufficient to support a verdict in favor of the plaintiffs; and second, that the plaintiffs failed to offer sufficient evidence from which a reasonable jury could have found that Southern Farm reviewed the decedent's application in bad faith.  Although the plaintiffs are generally of the opinion that the judgment of the district court should be affirmed, they raise two arguments on cross-appeal:  (1) that the district court should have applied Kentucky law, rather than federal law, in computing post-judgment interest; and (2) that they were entitled to seek punitive damages.  For the following reasons, the judgment of the district court will be affirmed in part and reversed in part.

**I.**

**A.**

The parties do not dispute the material facts of the case; instead, they dispute whether these facts are sufficient to show that the defendant acted in bad faith in reviewing the life insurance application submitted by the decedent, Kenneth Stewart Riddle.

On August 12, 1998, Riddle completed an application for life insurance, with the assistance of the defendant's agent, Richie Estes.  The application was for $200,000 in life insurance coverage.  Riddle paid the first month's premium, as calculated by Estes based on the health and medical information disclosed by Riddle, and was given a conditional receipt.  This receipt contained certain conditions precedent to coverage, including the requirement that the defendant "be satisfied that each person proposed for insurance . . . is a risk insurable by the Company under its rules, limits, and standards for the plan and the amount applied for."  The application was received at the defendant's home office on August 18, 1998, and was given to an underwriter named Jeff Lewis.

On September 9, 1998, the defendant learned that Riddle had been killed in a motor vehicle accident.  Sometime later, the defendant's Regional Underwriting Manager, Bobbie Jo Myers, informed Lewis that Riddle was deceased; she then took over the Riddle file.  The file was then reviewed "by Myers, by . . . her boss, Chief Underwriter Danny Collins . . . , and by his boss, Vice President of Underwriting Denny Blaylock."  The defendant claims that this procedure is always followed when the company learns of the death of an applicant during the underwriting process, but it could produce no written policy or other documentation to support this claim.  The district court noted that although the defendant claimed that each of these persons "expressed grave concerns over the same medical conditions," each, in fact, "had strikingly different underwriting 'concerns.'"  "As the review proceeded up the chain of command from Myers to Collins to Blaylock, the number of medical 'concerns' increased."  Strangely, the first concern Collins noted in the underwriting form about Riddle's "medical problems" was:  "1 month prem. paid."  Blaylock testified that "the fact that [Riddle] was deceased was not a factor in our action," but he admitted that Riddle's medical records had been scrutinized more closely than in the average case, and, at one point, he admitted that he went through the file with a "fine-tooth comb."

On October 6, 1998, the defendant sent a notice to Riddle's children that their father was "uninsurable"; that coverage was denied; and that premium paid would be refunded. The notice informed the family that Riddle "was uninsurable when the application was completed" because "your father's medical history . . . includes rheumatoid arthritis, chronic obstructive lung disease with continued smoking, high blood pressure being treated by medication and other underwriting concerns." The defendant did not disclose what these "other underwriting concerns" were, and the district court noted that such vague references could support an inference that the defendant was simply "attempt[ing] to avoid be[ing] pinned down to specific reasons for the denial."

Despite the fact that underwriters Myers, Collins, and Blaylock had "strikingly different underwriting 'concerns,'" the defendant's investigation of Riddle's file did reveal that Riddle suffered from a number of serious ailments. Furthermore, it would appear that Riddle was not entirely forthcoming in describing, in his life insurance application, either the severity or nature of his medical condition. Nevertheless, in denying the defendant's motion for summary judgment, the district court noted that although the plaintiffs' evidence of bad faith was circumstantial, there was "considerable additional evidence that suggests that the Defendant may have been looking for ways to avoid coverage."

## B.

The plaintiffs had initially filed suit in Adair Circuit Court in the Commonwealth of Kentucky, alleging that the "Defendant's actions in finding that . . . Riddle was not insurable at the time that the application was made, was [sic] not made in good faith." They sought to recover the full value of the policy for which Riddle applied, with interest, as well as "punitive damages according to proof." The case was then removed to the United States District Court for the Western District of Kentucky, on the basis of diversity.

The district court denied the parties' cross-motions for summary judgment, and in an Order and Opinion issued on August 26, 2002, the court denied the defendant's motion to bifurcate the trial and held that punitive damages were not available to the plaintiffs because theirs was a contract claim for which punitive damages are unavailable under Kentucky law. The case proceeded to trial by jury. The defendant moved for judgment as a matter of law at the end of the plaintiffs' case-in-chief and again at the close of all evidence. The district court denied both motions, and a verdict was subsequently rendered in the plaintiffs' favor for $200,000, the full amount of the insurance policy. Shortly thereafter, the district court granted the plaintiffs' motion for pre-judgment and post-judgment interest, but held that post-judgment interest was to be determined at the federal rate of interest, and not in accordance with Kentucky law.

The defendant appealed, challenging "the final Judgment entered in this action on the 7th day of November, 2002." The plaintiffs also appealed, challenging "the Opinion and Order entered on the 26th day of August, 2002, the Final Judgment entered on the 7th day of November, 2002, and the Memorandum Opinion and Order entered on the 7th day of November, 2002."

## II.

## A.

The defendant argues that the judgment of the district court must be reversed because it is based on an erroneous understanding of Kentucky law. We disagree.

**1.**

The district court instructed the jury as follows: "You will find for the Plaintiffs if you are satisfied from the evidence that the Defendant did not act in good faith in determining whether Mr. Riddle was insurable at the rate applied for; otherwise you will find for the Defendant." The court stated that it would follow the rationale expressed in *Rohde v. Massachusetts Mutual Life Insurance Co.*, 632 F.2d 667 (6th Cir. 1980), where it was held that, under *Ohio* law, "if the insurer breaches the duty of good faith in undertaking the contractual obligation of determining insurability, a contract of insurance exists; and the question of insurability, had a good faith inquiry been made, is irrelevant." The court found that there was "nothing novel in *Rohde*'s application of traditional contract law" and stated that "if the Kentucky Supreme Court were to address this issue, it would agree with that reasoning and apply it to cases brought pursuant to [Kentucky caselaw]" holding that insurers have a duty to determine an applicant's insurability in good faith.

Southern Farm contends that the district court erred as a matter of law in applying the rationale of *Rohde*, because, it argues, under Kentucky law, a conditional receipt will be enforced according to its plain and unambiguous terms. If coverage under a conditional receipt is subject to a condition precedent, an applicant is bound by that condition, and courts may not rewrite the contract to eliminate this condition. Thus, as coverage under the conditional receipt was subject to the condition precedent that Riddle had to "be insurable under the company's standards for the plan applied for," and as the plaintiffs failed to prove that Riddle satisfied the condition precedent, Riddle was not covered by the conditional receipt, regardless of whether Southern Farm reviewed his application in bad faith.

**2.**

It is well-settled that we review questions of law *de novo*. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 192 (6th Cir. 1997).

**3.**

We reject the defendant's argument because it is inconsistent with basic tenets of Kentucky contract law. Insurance policies are simply contracts between an insurer and an insured. *See Haney v. Yates*, 40 S.W.3d 352, 354 (Ky. 2000); *Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co.*, 983 S.W.2d 501, 504 (Ky. 1998); *City of Louisville v. McDonald*, 819 S.W.2d 319, 320 (Ky. Ct. App. 1991). When, as here, federal jurisdiction is based upon diversity of citizenship, we must apply the law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Stalbosky v. Belew*, 205 F.3d 890, 893 (6th Cir. 2000). The defendant argues, *inter alia*, that the district court erred in applying the rationale of *Rohde* because that case applied Ohio, rather than Kentucky, law. But as the district court pointed out, "there is nothing in *Rohde* beyond the application of traditional contract law." As we shall explain, Kentucky law requires us to follow the same rule we followed in *Rohde*, and the district court did not err in applying that rationale.

*Rohde* involved a question of coverage under a conditional receipt. *Rohde*, 632 F.2d at 668. The defendant insurance company gave the plaintiff's husband a conditional receipt which

> contained a promise by the defendant to insure the applicant under the policy sought, effective the latest date on which the applicant completed the application and physical examination. The receipt further stated that defendant had no obligation except to return payment unless the company determined that as of the completion of the physical and application the applicant was an acceptable risk under its "limits, rules, and standards."

*Id.*

The applicant died the same day he applied for life insurance. *Id.* The defendant insurance company denied liability under the conditional receipt, claiming the applicant was uninsurable for the policy sought. *Id.* The applicant's widow sued, claiming "that defendant's bad faith determination that her husband was an unacceptable risk entitle[d] her, as beneficiary, to recover the full value of the insurance policy applied for by her husband." *Id.*

The trial court found that the defendant acted in bad faith in denying liability under the conditional receipt. *Id.* at 670. Nevertheless, "the district court proceeded to determine what conclusion the defendant would have reached had it acted in good faith." *Id.* The court determined that had the defendant acted in good faith, it would have found "that the applicant was uninsurable under the standard policy applied for." *Id.* Accordingly, the district court concluded that the defendant was not liable.

Applying Ohio law, we reversed, holding that the district court's "analysis fail[ed] to give defendant's bad faith determination of the applicant's uninsurability proper legal effect under Ohio law." *Id.* We explained:

> defendant's good faith determination that the applicant meet the defendant's standards of insurability was a condition precedent to defendant's liability under the contract represented by the conditional receipt. When the defendant acted in bad faith and determined that the applicant failed to meet the defendant's standards, then the defendant's own act prevented the occurrence of the condition precedent. The nonoccurrence or nonperformance of a condition is excused where that failure of the condition is caused by the party against whom the condition operates to impose a duty. Defendant's failure to honor its obligation of good faith in exercising its right to examine the application deprives defendant of any benefit it might obtain from that condition. The fact that the defendant might have found the applicant uninsurable had the defendant acted in good faith is not relevant under Ohio law.

*Id.* (internal citations omitted).

The same result obtains under Kentucky law, which holds that a conditional receipt

> creates a contract of preliminary insurance with the reserved right in the insurer to determine *in good faith* the applicant's insurability; and that if the applicant is determined not to have been an insurable risk at the time of the application the company is not liable for a death that occurs during the period covered by the receipt.

*Investors Syndicate Life Ins. & Annuity Co. v. Slayton*, 429 S.W.2d 368, 370 (Ky. Ct. App. 1968) (emphasis added). In *Slayton*, the Kentucky Court of Appeals held that the insurance company was entitled to a directed verdict because the record showed "good faith beyond reasonable dispute." *Id.* The court followed the rule that unless an insurance company's "decision was not made in good faith[,] it is conclusive of the company's nonliability." *Id.*

A direct corollary of this rule is that an insurance company's decision to reject a claim is not conclusive when that "decision was not made in good faith." Southern Farm concedes that if there is sufficient evidence to support the jury's finding of bad faith, the company's rejection of Riddle's application is not conclusive. But, the company argues, that in order to recover under the policy, the plaintiffs were bound to show that the defendant would have found Riddle insurable had it acted in good faith. As the plaintiffs presented no evidence that could have established this fact, Southern Farm concludes that it cannot be liable under the conditional receipt.

We think this analysis fails to give the defendant's bad faith rejection of Riddle's application proper legal effect under Kentucky law. It is true, as the defendant points out, that under Kentucky law, conditions precedent are given full effect and may not be eliminated from insurance contracts by the courts. *See, e.g.*, *Slayton*, 429 S.W.2d at 370; *Northwestern Mut. Life Ins. Co. v. Neafus*, 140 S.W. 1026, 1028-29 (Ky. Ct. App. 1911). Furthermore, Kentucky courts have held that, "[i]n an action on an insurance policy, the insured must prove compliance with the policy's conditions precedent or a waiver thereof to recover under its terms." *Am. Centennial Ins. Co. v. Wiser*, 712 S.W.2d 345, 346 (Ky. Ct. App. 1986). The defendants would rely on these principles alone while disregarding another important aspect of Kentucky law.

Southern Farm's liability under the conditional receipt was subject to the condition precedent that the defendant had to "be satisfied that [Riddle] . . . [wa]s a risk insurable by the Company under its rules, limits, and standards for the plan and the amount applied for." But, under Kentucky law, the company was required to make a *good faith* determination whether Riddle met the Company's standards of insurability. *See Slayton*, 429 S.W.2d at 370. Kentucky courts have long held that "if it be shown that the party obligated has prevented the creation of the conditions under which the payment would be due, without fault on the part of the other party, he is estopped to avail himself of a situation brought about by his own wrong." *Odem Realty Co. v. Dyer*, 45 S.W.2d 838, 840 (Ky. Ct. App. 1932). As early as 1809, the Kentucky Court of Appeals held that where the party obligated prevents the performance of a condition precedent, "the condition ought to be holden as performed." *Marshall v. Craig*, 4 Ky. 379, 386 (1 Bibb 379), 1809 WL 746, at *3 (Ky. Ct. App. 1809). Assuming for the moment that the defendant acted in bad faith in determining that Riddle did not meet the defendant's insurability standards, then the defendant's own act prevented the occurrence of the condition precedent. The nonoccurrence or nonperformance of a condition is excused where the failure of the condition is caused by the party against whom the condition operates to impose a duty. Almost two hundred years of Kentucky case law is unequivocal on this point. *See, e.g.*, *Cowden Mfg. Co. v. Sys. Equip. Lessors, Inc.*, 608 S.W.2d 58, 61 (Ky. Ct. App. 1980); *Bryant v. Jones*, 75 S.W.2d 34, 38 (Ky. Ct. App. 1934); *Duckworth v. Routt*, 45 S.W.2d 848, 849 (Ky. Ct. App. 1932); *Continental Ins. Co. v. Vallandingham & Gentry*, 76 S.W. 22, 24 (Ky. Ct. App. 1903); *Louisville & N.R. Co. v. Goodnight*, 73 Ky. 552, 554 (Ky. Ct. App. 1874); *Marshall*, 4 Ky. at 386. If Southern Farm failed to honor its obligation of making a good faith determination whether Riddle was insurable under its standards for the plan applied for, the company is deprived of any benefit it might have received from that condition.

The defendant argues that in spite of the language of the conditional receipt and Kentucky law, which make coverage conditional on the defendant's *good faith* determination that Riddle was "a risk insurable by the Company under its rules, limits, and standards for the plan and the amount applied for," we should read Kentucky law and the contract as making liability under the conditional receipt dependant upon a good faith determination, whether by the defendant *or the jury*, that Riddle was, in fact, an insurable risk under the defendant's rules, limits, and standards for the plan and the amount applied for. Implicit in this argument is the contention that *Slayton* stands for nothing more than the proposition that when an insurance company *fails* to make a coverage determination in good faith, the only consequence is that the company is subject to suit in which the applicant will have the opportunity to prove that he was an insurable risk at the time of the application. And if a plaintiff does not succeed in proving that the insurance company acted in bad faith, then the insurance company's determination of non-insurability "is conclusive of the company's nonliability." *Slayton*, 429 S.W.2d at 370. We disagree.

Our examination of Kentucky law has revealed no authority that would justify abandonment of the well-established principle of Kentucky contract law that a party to a contract here, the defendant-insurer, may not rely on the nonoccurrence of a condition precedent here, the applicant's medical insurability, which the company itself prevented from occurring. *Slayton* teaches that the

conditional receipt created a contract of insurance, subject to Southern Farm's *good faith* determination of insurability with respect to the plan applied for. *Id.* In Kentucky, an insurance company's failure to determine, in good faith, an applicant's insurability before rejecting coverage deprives it of any benefit it might obtain from that condition. So long as the plaintiffs produced sufficient evidence to convince a reasonable jury that the defendant rejected Riddle's application in bad faith, the fact that Southern Farm might have found Riddle uninsurable had they acted in good faith is not relevant under Kentucky law.

**B.**

The defendant argues, in the alternative, that the judgment of the district court must be reversed because the plaintiffs failed to produce any evidence that the company reviewed Riddle's file in bad faith. The defendant argues that it "obviously" did not review the application in bad faith, and there was insufficient evidence of bad faith "to warrant submitting the case to a jury." The defendant concludes that reversal is appropriate because "[t]he Plaintiffs' case [wa]s insufficient as a matter of law."

The defendant is apparently challenging the district court's denial of its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), made at the close of all evidence. We review a district court's denial of a motion for judgment as a matter of law *de novo*. *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003). A federal court exercising its diversity jurisdiction applies the law of the state whose substantive law governs the action to determine whether to grant or deny a motion for judgment as a matter of law based on insufficiency of the evidence. *See Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998).

> Under Kentucky law, a motion for a directed verdict—the same thing as a motion for judgment as a matter of law under Rule [50(a)]—should be granted only if "there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992). In deciding such a question, "every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 125 (Ky. 1991).

*Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997).

The issue of the defendant's bad faith turns largely on the inferences to be drawn from the evidence regarding the defendant's motive in closely scrutinizing Riddle's application. Once the defendant learned that Riddle was deceased, the company's Regional Underwriting Manager, Bobbie Jo Myers, took over the file from Jeff Lewis, the underwriting consultant initially assigned to Riddle's application. The file was subsequently reviewed by Myers, Chief Underwriter Danny Collins, and Vice President of Underwriting Denny Blaylock. The defendant claims that it was merely adhering to company policy in following this procedure, but could not produce any documentation to substantiate its claim.

As Riddle's file proceeded up the chain of scrutinizers, the number of medical concerns noted by each reviewer increased. Virtually every reference to a medical condition in the records, no matter how serious, was cited by the reviewers as a basis for denying coverage, even when there was no supporting clinical evidence for those conditions, and sometimes in the face of contrary clinical findings. Both Myers and Collins cited rheumatoid arthritis as a concern despite a blood test that returned negative for that condition. All three reviewers seized upon a reference to alcohol abuse in a 1996 letter from Dr. Yusuf Deshmukh, a reference which Myers acknowledged to be

"vague," despite the absence of any mention of alcohol abuse in the medical records from Dr. Phil Aaron, Riddle's treating physician. Notably, the very first "medical" concern listed by Collins was the fact that Riddle had paid only one month's premium before he died.

Blaylock made the ultimate decision to deny coverage. At trial, Blaylock testified that he did not review Riddle's application any more closely because Riddle had died, but was then impeached by his deposition testimony in which he admitted the application was scrutinized more closely than in the average case. At one point, he acknowledged that he went through Riddle's file with a "fine-tooth comb." We agree with the district court that the defendant's heightened degree of "scrutiny might raise an inference that the Defendant sought to be as thorough and fair as possible. It might just as easily, however, raise an inference that the company was looking for reasons to deny coverage. Choosing between two reasonable inferences is the function of the jury." Similarly, the defendant's initiation of a more intense investigation of Riddle's medical history immediately after learning of his death might be explained by equally plausible motives. The defendant received Riddle's medical records from Dr. Aaron the same day the company learned of his death. The fact that more medical records were requested the very next day might be explained by the defendant's concern over previously unknown health problems mentioned in those records. On the other hand, the investigation might also raise the inference that the defendant was attempting to procure some colorable medical reason to deny coverage.

The plaintiffs, as the nonmoving party, are entitled to every reasonable inference in reviewing a motion for judgment as a matter of law. *Baylis*, 805 S.W.2d at 125. We do not deny that the medical evidence tends to show that Riddle was seriously ill and perhaps uninsurable under certain standards. Under Kentucky law, however, it is irrelevant whether the defendant *could have* denied Riddle's application in good faith if the evidence shows that the defendant, in fact, reviewed the application in bad faith. We have reviewed the evidence, and we have considered the reasonable inferences to be drawn from that evidence, and we cannot say that reasonable minds could not differ as to whether the defendant acted in bad faith. Accordingly, the district court did not err in denying the defendant's motion for judgment as a matter of law and submitting the issue to the jury.

## C.

On cross-appeal, the plaintiffs ask this court to "find as a matter of law that in diversity cases, . . . [the] post-judgment interest rate is established by the state law, which in this case would be 12% per annum." The district court applied 28 U.S.C. § 1961 and held that post-judgment interest must be determined at the federal rate of interest. We review questions of law *de novo*. *Voinovich*, 130 F.3d at 192.

Section 1961(a) provides, in pertinent part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. the date of the judgment.

28 U.S.C. § 1961 (West Supp. 2004) (footnote omitted).

"In diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest." *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000) (citing *Clissold v. St. Louis-San Francisco Rwy. Co.*, 600 F.2d 35, 39 n.3 (6th Cir. 1979)); *see also Weitz Co. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382, 1386 (8th Cir. 1983). Applying

the unambiguous language of the statute and the cited caselaw, it is evident that the district court did not err in applying the federal rate of interest.

## D.

### 1.

Finally, the plaintiffs argue that the district court erred in refusing to allow them to pursue their claim for punitive damages. The district court reasoned that the only issue presented in this case was whether a valid contract of insurance existed, not whether there was a bad faith failure to pay claims clearly due and payable. Consequently, the court held that punitive damages were not available under Kentucky law. The plaintiffs counter that under Kentucky law, "it [is] clear that an insured may recover in tort where an insurance company acts in bad faith in dealing with the insured and may recover consequential and punitive damages." We review questions of law *de novo*. *Voinovich*, 130 F.3d at 192.

Kentucky law provides: "In no case shall punitive damages be awarded for breach of contract." Ky. Rev. Stat. Ann. § 411.184(4). Nevertheless, the Kentucky Supreme Court has "recognize[d] a cause of action to recover tort damages against insurance companies upon proof of bad faith failure to pay claims clearly due and payable." *Wittmer v. Jones*, 864 S.W.2d 885, 886 (Ky. 1993). Thus, where a breach of contract is accompanied by tortious conduct, that is, "when an insurance company acts in bad faith in dealing with its own insured," punitive damages may be awarded. *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 178 (Ky. 1989).

The parties dispute whether a valid contract of insurance existed between Southern Farm and Riddle. Southern Farm believed that no contract existed because of the failure of a condition precedent. The plaintiffs argued that a valid contract existed because the defendant's tortious bad faith denial of Riddle's application foreclosed the defendant from relying upon the nonoccurrence of the condition precedent. The district court concluded that the parties' dispute over insurance contract formation did not amount to a dispute over coverage, and thus, did not constitute a bad faith failure to pay a claim giving rise to punitive damages.

We do not agree that the sole issue in this case was whether any contract of insurance came into existence. The plaintiffs claimed not only that a valid contract existed, but also that, pursuant to the terms of that contract, they were entitled to the full value of the insurance policy once Riddle became deceased. As such, both contract formation and Southern Farm's alleged bad faith refusal to pay a valid claim were issues for jury determination. That being so, the jurors should have been instructed that, under Kentucky law, they were free to consider punitive damages if they first found the defendant had deliberately rejected the plaintiffs' claim in bad faith.

We think the district court erred in denying the plaintiffs' request for an instruction on the availability of punitive damages and the plaintiffs are entitled to a new trial solely on that issue.

## III.

For the foregoing reasons, the district court's judgment holding the defendant liable to the plaintiffs in the amount of $200,000—the face amount of the policy—is **AFFIRMED**, but the judgment, as entered, is **VACATED** and the case is **REMANDED** for a new trial on the question of punitive damages only.

_____

**DISSENT**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.  Because I conclude that the district court erred in failing to grant the defendant judgment as a matter of law, and because the majority has failed to apply controlling Kentucky state precedents on review of the district court's decision, I respectfully dissent.  The question of "bad faith" is one of law for the court's determination, not a question of fact for the jury, and a claim of bad faith requires a showing of intentional wrong-doing or recklessness, neither of which was established by the proof in this case.

The majority is correct in its narration of the facts in Section I., as far as that narration goes.  The record now before us reflects that Kenneth Riddle suffered from several long-term, serious medical conditions, most of which were not revealed in his application for insurance and any one of which, when discovered, would have rendered him completely uninsurable or, at the very least, uninsurable for the premium originally quoted.  But the majority's recitation of the facts concerning the processing of the Riddle application fails to set out significant information concerning the review of the applicant's medical file and the conclusions to be drawn from that review, as reflected in the testimony of several witnesses for the defense.  Under controlling Kentucky case law, that evidence establishes that the company acted in good faith in declining to issue a policy of life insurance in this case.

The majority may also be correct in the legal analysis provided in Section II.A. with regard to conditions precedent under *Rohde v. Massachusetts Mutual Life Insurance Co.*, 632 F.2d 667 (6th Cir. 1980), and the question of whether the Ohio rule of contract law discussed in that opinion is equally applicable to Kentucky contract law.  That question, however, is simply irrelevant to the determination of this appeal.  The error in the majority's analysis comes in the conclusion at the end of Section II.A. that "[s]o long as the plaintiffs produced sufficient evidence to convince a reasonable jury that the defendant rejected Riddle's application in bad faith, the fact that Southern Farm might have found Riddle uninsurable had [it] acted in good faith is not relevant under Kentucky law."  Under Kentucky law, however, the question of bad faith is initially one for the trial court, not the jury, and a finding of bad faith cannot be based, as the majority would have it here, on a finding of nothing more than the fact that the application was subjected to heightened scrutiny following the death of the applicant.

Finally, the majority is correct to rely on the opinion in *Investors Syndicate Life Insurance & Annuity Co. v. Slayton*, 429 S.W.2d 368 (Ky. Ct. App. 1968), which – in the absence of a definitive treatment of the issue by the Kentucky Supreme Court  – is apparently the leading case on "conditional receipts" under Kentucky insurance law.  But the majority has relied on only selective portions of the opinion in *Slayton*, conveniently omitting any reference to or discussion of the relevant rulings in that case.

In *Slayton*, the court, as here, was asked to review a jury verdict in favor of the beneficiary of an applicant for life insurance who was killed in an accident within days after mailing the application to the home office of the defendant insurance company.  Although the opinion does not indicate when the company received notice of John Slayton's death, clearly the company learned of it during its investigation of Slayton's medical history as a result of having contacted his father to get permission to inspect the son's medical records.  That investigation revealed that Slayton was medically uninsurable on the day of the application, and the company declined to issue the policy.

The investigation also revealed that Slayton – like Riddle – had made material misrepresentations on the application, setting up a defense for the insurance company that was presented to and rejected by the jury that heard Slayton's case. On appeal, the Kentucky Court of Appeals determined that the materiality of the misrepresentations in the application was not the controlling issue, however, and focused instead on "whether any contract of insurance ever came into existence," which was the insurance company's alternate defense and the same question that concerns us here:

> It is to be remembered that the death occurred before the company had taken any action on the application. So if Slayton was insured when he died it was because of the "Conditional Receipt" [contained in the application], which was the only basis of the obligation of the company at the time of death.

The "Conditional Receipt" was as follows:

> "The insurance shall be effective as on the date of this receipt or the date of completion of medical examination ordinarily required by company, whichever is later, if Company at its home office shall be satisfied that on said date the person or persons proposed for insurance were in good health and insurable on the plan applied for, and at the premium rates stated in the application."

429 S.W.2d 368, 370.

The *Slayton* court also recognized that this conditional receipt created a valid contract, described straightforwardly in the following terms:

> [I]t creates a contract of preliminary insurance with the reserved right in the insurer to determine in good faith the applicant's insurability; and . . . if the applicant is determined not to have been an insurable risk at the time of the application the company is not liable for a death that occurs during the period covered by the receipt.

*Id.*

The conditional receipt in this case was functionally the same as Slayton's; indeed, it employed some of the same language and provided that insurance coverage would not become effective prior to delivery of the policy "unless and until each and every one of [certain] conditions have been fulfilled exactly." Those conditions included, among others, a requirement that "the Company must be satisfied that each person proposed for insurance or annuity in this application is a risk insurable by the Company under its rules, limits, and standards for the plan and the amount applied for without any modification either as to plan, amount, riders, supplemental agreements, and/or the rate of premium paid." The receipt further specified, as did Slayton's, that "[i]f one or more of the conditions of paragraph 1 have not been fulfilled exactly, there shall be no liability on the part of the Company except to return the applicable payment in exchange for this Receipt." And as Southern Farm Bureau did here, the defendant insurer in *Slayton* found that the applicant was not insurable on the day that the application was made.

The *Slayton* court did not find it necessary to engage in a discussion of the legal intricacies of conditions precedent, instead going straight to the heart of the dispositive issue and holding that "[u]nless that decision [that Slayton was uninsurable] was not made in good faith it is conclusive of the company's nonliability." *Id.* The court then concluded, with no apparent difficulty, that "the record shows good faith beyond reasonable dispute." *Id.* What, exactly, the Kentucky court considered in finding good faith is certainly of significance in this case, although it would be hard

to discover its importance from reading the majority opinion in this appeal. The *Slayton* court's complete analysis is as follows:

> Commonwealth Life Insurance Company had refused to insure Slayton on the ground of his uninsurability. Underwriting manuals of several companies classed a person with Slayton's medical history as uninsurable. The opinion stated by several witnesses for the claimant here, that prudent and careful underwriters would not have rejected insurance for a person with Slayton's history, does not in our opinion tend to establish bad faith in the rejection by the appellant here in view of the positive evidence that Commonwealth Life had rejected him and that other company's [sic] manuals classed a person with his history as uninsurable.

*Id.* As a result, the court in *Slayton* reversed the trial court's judgment, thereby setting aside the jury's verdict, and entered an order dismissing the plaintiff's claim. We should do the same with Riddle's claim in this case.

Although the factual and legal postures of *Riddle* and *Slayton* are strikingly similar, the majority here has ignored at least two fundamental holdings in *Slayton* that should be controlling in *Riddle* as a matter of Kentucky state law. Perhaps the most single most dispositive element of the *Slayton* opinion is the court's determination that *the question of whether the insurance company acted in good faith is one of law for the court to determine.* While this holding is not explicit, it is clear not only from the court's analysis and its mandate, but also from the fact that one member of the *Slayton* panel "dissent[ed] on the ground that in his opinion the question of whether or not the company made the determination of noninsurability in good faith is one of fact for the jury" and thought the case should be remanded for retrial. *Id.* at 371. Obviously, the district court here erred in sending the question of good faith in Riddle's case to the jury, instead of making the determination on motion for summary judgment. Once the case came before the jury, the error was compounded when the defendant sought and was denied a directed verdict on the question of good faith.

Moreover, if the existence of good faith was clear to the state court in *Slayton*, it ought to be equally apparent to the majority here. The record in this case simply fails to show *any* proof of bad faith, i.e., that the company deviated in any significant respect from its normal routine in processing the Riddle application. The first underwriter to receive the file, Jeff Lewis, was a junior member of the company, unable to approve an application for any amount of insurance over $150,000. Unquestionably, he would have had to pass the application to the next highest level for authorization, which, in any event, would not have been forthcoming until the necessary medical investigation was completed. Because Riddle's death came to the company's attention before the file had been transferred, it was taken over directly by the regional manager, Bobby Jo Myers, in conformity with the company's underwriting procedure in the event of an applicant's death. (The majority insinuates that this transfer was evidence of bad faith on the company's part because the defendant "produce[d] no written policy or other documentation to support this claim." But, under controlling Kentucky legal authority set out below, the company's action in following routine procedure, even if done negligently, simply does not rise to the level of "bad faith.")

Given the limited (and contradictory) information contained in Riddle's initial application, the company clearly would have required investigation of Riddle's medical records before authorizing issuance of a policy, *whether or not Riddle had died during the "conditional receipt" period.* The ensuing investigation turned up evidence that unequivocally established Riddle's uninsurability, certainly at the rate quoted in the application and, quite possible, at any rate. What is missing from the majority's recitation of the evidence in this case is the testimony, completely unrebutted by the claimant, that once the medical files were assembled, they were evaluated using

Southern Farm Bureau's point system to assess risk, a system taken from the risk assessment manual of Lincoln National Insurance, one of the company's reinsurers. That evaluation revealed a total of 600 points in connection with the medical conditions apparent in the Riddle medical reports, a sum that was 455 points above the maximum for the standard insurance policy for which Riddle had applied. No "rated policy" at a higher premium was offered, of course, because with Riddle's demise, there was no one to whom to make the offer.

In addition, the defendant called as a witness an industry expert in life underwriting who testified that the defendant's underwriting process in this case fully complied with accepted standards of the life insurance industry, including the investigation of the applicant's medical records, the review process occasioned by the applicant's death during the underwriting process, and the handling of the notification process to the beneficiaries of the rejected policy.[1] This expert testimony is completely uncontradicted in the record and alone would have been sufficient to satisfy the *Slayton* court that the defendant had acted in good faith in declining to issue a policy.

What, then, is the evidence of bad faith in this case?

■   As the majority notes, "[t]he issue of the defendant's bad faith turns largely on the inference to be drawn from the evidence regarding the defendant's motive in closely scrutinizing Riddle's application." But the record contains evidence that the process met industry standards, and that evidence was wholly unrebutted by the claimant.

■   The majority further points to the fact that "[a]s Riddle's file proceeded up the chain of scrutinizers, the number of medical concerns noted by each reviewer increased." But that escalation was due in no small part to the fact that medical records and medical opinions continued to come in while the underwriting process was in progress, revealing even more dramatically each time a report was received the extent of Riddle's duplicity in the original application.[2]

■   The majority faults two of the reviewers for "cit[ing] rheumatoid arthritis as a concern despite a blood test that returned negative for that condition." But what the majority fails to note is what the blood test *did* show, i.e., that Riddle was suffering from a long-term, severe case of psoriatic arthritis, which carries the same rating for insurance underwriting purposes as rheumatoid arthritis. Expert medical testimony revealed that psoriatric arthritis and rheumatoid arthritis are both auto-immune diseases; they share the same symptoms; and they are routinely confused with one another, even by medical experts, who sometimes use the terms interchangeably. Indeed, the notes of Riddle's primary physician continued to refer to his condition as "rheumatoid arthritis," even though he was treating his patient for psoriatic arthritis. Significantly, the two diseases are treated with equally heavy-duty medications, including Methotrexate, which Riddle had been taking for a lengthy period of time, estimated at "10-20 years." One outside

---

[1]This witness, Richard Usry, a reinsurance underwriting vice president for a large national reinsurance company, was also asked to review Riddle's medical records *without knowing that Riddle was deceased*, and came to the conclusion that Riddle was uninsurable, based on his use of Methotrexate for over 10 years, his history of alcohol abuse, his elevated GGT level, and his rheumatoid or psoriatric arthritis, which he would have rated equally.

[2]For example, asked if he suffered from arthritis, Riddle reported only that he had osteoarthritis, a degenerative disease suffered by almost everyone beyond a certain age and certainly not a condition that would cause a red flag on his file. Later medical reports indicated that the osteoarthritis was in Riddle's knees, arms, shoulders, and lower spine. He did not reveal that he had been treated for severe psoriatic arthritis or that he had been on Methotrexate for over ten years.

medical expert testified that the safe lifetime dosage of Methotrexate – a medication used only in severe cases of psoriatic or rheumatoid arthritis – is 1,500 mg. Riddle's records reflected that at the time of his death he had taken 3,900 mg., more than twice the recommended life-time dosage, but he did not indicate that he was taking Methotrexate on his insurance application. Riddle also did report that he was taking prednisone. Indeed, one expert witness testified that as a long-term user, Riddle was "prednisone-dependent," risking serious side effects. Records indicate that his physician had been trying to wean Riddle from the medication for at least two years, without apparent success.

■  The majority also cites as evidence of bad faith the fact that "reviewers seized upon a reference to alcohol abuse in a 1996 letter from Dr. Yusuf Deshmukh, a reference that [one of the reviewers] acknowledged to be 'vague,' despite the absence of any mention of alcohol abuse in the medical records from Dr. Phil Aaron, Riddle's treating physician." But read in context, Dr. Deshmukh's reference to alcohol abuse was actually a confirmation of information apparently received from Dr. Aaron (Riddle "is as you recall abusing alcohol and cigarettes and I have talked to him regarding those, to stop smoking as [well] as to stop alcohol"). The notation was important, the record shows, because alcohol should not be consumed by someone on Methotrexate, which has an undesirable "synergistic effect with alcohol" that can result in serious liver damage. Moreover, more than one lab report in the record indicates that the level of GGT in Riddle's liver was elevated some 2.5 times above normal, a test result normally associated with alcohol abuse. Riddle's abuse of cigarettes was also significant because he suffered from chronic obstructive pulmonary disease (COPD), a condition that, according to the record is "irreversible and usually progressive," making it "important for the patient to quit smoking, otherwise it is very difficult to ever successfully gain control of the disease." However, Riddle indicated on his application for insurance that he was smoking a pack to a pack-and-a-half of cigarettes daily, in spite of Dr. Deshmukh's "long discussion with him" concerning the need to stop smoking. He had been hospitalized several times within the three years prior to his death for bronchitis and related pulmonary ailments. All this was in addition to medication that Riddle was taking for chronic high blood pressure, which, less than a year prior to his death was reported as "hypertension not controlled by medication." And, yet, when asked by the insurance agent when he had last seen a physician and why, Riddle responded merely that he had seen Dr. Aaron in that past spring for "allergy symptoms, no complications."

■  Finally, the majority pins a "bad faith" label on the fact that "[t]he defendant received Riddle's medical records from Dr. Aaron the same day the company learned of his death" and speculates that"[t]he fact that more medical records were requested the very next day might be explained by the defendant's concern over previously unknown health problems mentioned in those records." But the company would have been negligent *not* to request more records after learning that Riddle had suffered from severe psoriatic arthritis and persistent COPD and, moreover, Riddle had signed a form in connection with his application that authorized an additional medical examination and various lab tests to be used in the underwriting process. No bad faith can be attributed to the defendant in seeking to secure and act on the results of those tests.

Would the *Slayton* court have found this purported evidence of bad faith sufficient to overcome testimony regarding the defendant's good faith in rejecting the application? Applicable Kentucky state law strongly suggests that it would not. Indeed, mere invocation of the words "bad faith" by the claimant cannot serve to transform otherwise legitimate actions and responses by the company into

"evidence" sufficient to counteract a motion for judgment as a matter of law.  We have previously recognized that Kentucky law imposes a significantly greater burden upon a claimant in Riddle's position.  In *Big Yank Corp. v. Liberty Mutual Fire Insurance Co.*, 125 F.3d 308, 312 (6th Cir. 1997), we stated:

> Under Kentucky law, an insured may recover damages for an insurer's bad faith only upon a showing that the insurer committed *some intentional wrongful conduct.  See Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 177 (Ky. 1989) (resurrecting the tort of bad faith as a viable cause of action in Kentucky after it had briefly been abolished); *Blue Cross & Blue Shield of Kentucky, Inc. v. Whitaker*, 687 S.W.2d 557, 559 (Ky. Ct. App. 1985) ("[A]n action for bad faith . . . requires something more than mere negligence.  The term itself implies some intentional wrongful conduct.  . . . *Mere errors in judgment should not be sufficient to establish bad faith*."); *see also Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991) (". . . [M]ere negligent conduct will not support a bad faith action [under Kentucky law].  *Liability for bad faith will arise only in those instances where an insurer acts with some degree of conscious wrongdoing, recklessness or in a manner which reveals an unjustified gamble at the stake of the insured*."), *aff'd*, 968 F.2d 1215, 1992 WL 146643 (6th Cir. 1992).

(Emphasis added.)  Relying upon medical records submitted by physicians and adhering to industry practices fall far short of exemplifying the types of affirmative misconduct required to impose liability upon Southern Farm Bureau in this case.

Likewise, Riddle cannot simply excise portions of the appellate record, thus eliminating uncontradicted explanations for the company's actions and decisions, and then argue that he has provided evidence of bad faith and created a "disputed issue of fact . . . upon which reasonable minds could differ."  *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. Ct. App. 1992).  In fact, by considering all evidence properly before the district judge in this matter, even drawing all reasonable inferences from that evidence in favor of Riddle, I would find that "there is a complete absence of proof," *id.*, of any bad faith on the company's part in denying insurance coverage to the claimant.  The district court thus should have granted the defendant's motion for judgment as a matter of law.

Under applicable principles of Kentucky law, the district court, and not the jury, was charged with the responsibility of determining whether the company's actions in this case could be construed as bad faith.  Because I fail to see how full consideration of the evidence presented could possibly lead to a finding that such an improper motive existed here, I respectfully dissent from the majority's contrary conclusion.