**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0215n.06

Case Nos. 19-5836/5838

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EPAC TECHNOLOGIES, INC., | ) | **FILED**<br>Apr 15, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| HARPERCOLLINS CHRISTIAN PUBLISHING, | ) | DISTRICT OF TENNESSEE |
| INC., fka Thomas Nelson, Inc., | ) | |
| | ) | |
| Defendant-Appellee/Cross-Appellant. | ) | |

**O P I N I O N**

BEFORE: SUTTON, McKEAGUE, and DONALD, Circuit Judges.

**McKEAGUE, Circuit Judge.**

What should have been a "simple" contract dispute—as the district court labeled this case at the summary judgment stage—has cost both parties millions of dollars in attorneys' fees and years of litigation. This dispute started when defendant Thomas Nelson, Inc. (acquired by HarperCollins Christian Publishing, Inc.) prematurely terminated a Master Services Agreement ("MSA") it had executed with plaintiff EPAC Technologies, Inc. EPAC sued, bringing numerous claims. Most claims were thrown out before trial, with only two claims going to the jury: breach of the MSA and fraudulent concealment. The jury returned a verdict in EPAC's favor on both claims. But the district court granted judgment notwithstanding the verdict in Thomas Nelson's

favor on the fraudulent concealment claim. EPAC now appeals and Thomas Nelson cross appeals. We affirm.

## I. FACTUAL BACKGROUND

EPAC is a book printer, and by 2008, EPAC was implementing a new, highly-automated digital "print-on-demand" process called EPAC2, which would allow it to print smaller quantities of books quickly (even having the capability of a 24-hour turnaround).

Thomas Nelson is an established book publisher that takes content from authors and other services and develops that content into consumable products such as print books, electronic books, and audiobooks. To meet its printing needs, Thomas Nelson contracts with various third-party printers, and its contracts vary by book type (including hard cover, soft cover, and color feature), turnaround time, and volume.

The parties first made contact in 2007 when EPAC's Senior Vice President for Sales and Marketing, Robert Cubelo, cold-called George Gower, a Thomas Nelson executive. At the time, Thomas Nelson was working with over 15 printers, and the parties began discussing whether EPAC could be one of Thomas Nelson's printers. Thomas Nelson was interested from the start because it was looking to reduce its inventory costs. Thomas Nelson eventually toured EPAC's Edison, New Jersey plant with Robert Cubelo and Sasha Dobrovolsky, EPAC's CEO. Before touring, Thomas Nelson signed a Confidentiality and Non-Disclosure Agreement ("CNDA"), which is at issue in this appeal. Through 2008 and 2009, the parties continued discussions and negotiations.

Critical to this appeal is how the two parties define this period. EPAC argues that the parties discussed forming a relationship and a "partnership," and the parties didn't wait until an agreement had been formalized before they started integrating their data sharing systems. EPAC

claims Thomas Nelson wanted to team up with EPAC to fundamentally change the logistics of its business. According to EPAC, Thomas Nelson suggested EPAC build a printing facility inside of the Thomas Nelson warehouse in Nashville. And EPAC opened a new printing facility in Fairfield, Ohio using the EPAC2 printing system to meet the expected printing needs of Thomas Nelson. On the other hand, Thomas Nelson characterizes this time as a period of extensive arm's-length contract negotiations.

The parties, both represented by counsel, finally executed the MSA in the summer of 2010. The contract was highly negotiated, and it went through more than ten versions. The MSA obligated Thomas Nelson to purchase certain categories of books from EPAC:

> Customer will order from EPAC all of Customer's requirements of 1-color softbound books that are in formats that EPAC supports . . . and that are defined by Customer as either Print-on-Demand, Short-Run, and Mid-Run but specifically excluding Web Offset/IRON. For avoidance of doubt and to be clear, titles with quantities exceeding 1,500 units are herein defined as Web/Offset/IRON. Print-on-Demand titles are defined to mean titles delivered with one day (1) turnaround in any quantity up to 499 units per title . . . . Short-Run titles are defined to mean titles delivered with four days (4) turnaround in quantities up to 499 units per title. Mid-Run titles are defined to mean titles delivered within seven (7) business days in quantities of 500 to 1,500 units per title.

The MSA provided for a five-year deal and for the primary production of books to occur at EPAC's Fairfield, Ohio facility, which was closest to Thomas Nelson's location.

Several circumstances surrounding the signing of the MSA are at issue in this appeal. Leading up to the execution of the MSA, Thomas Nelson was continuing discussions with one of its vendors, Lightning Source, Inc. Again, Thomas Nelson had various vendors to fill its needs. Thomas Nelson had a contract with Lightning Source, which had previously handled Thomas Nelson's digital printing needs—the same line of business arguably covered by the MSA. EPAC knew about Thomas Nelson's relationship with Lightning Source but claims that Thomas Nelson

"confirmed that EPAC would be the exclusive printer" for this area of business, except for a "handful of some old, very small volume books," where Lightning Source, rather than Thomas Nelson, owned the electronic files. So, at the very least, EPAC knew that Thomas Nelson still had some obligations to Lightning Source.

On the other hand, Thomas Nelson claims the MSA did not require it to use EPAC as the exclusive printer for all 1-inch, softbound books for orders of 1,500 or less. It was required only to use EPAC for the categories of books described above—those books defined as Print-on-Demand, Short Run, and Mid Run. And so, Thomas Nelson decided to go with both vendors. Indeed, in June 2010, Thomas Nelson informed Lightning Source that some of the work covered by Lightning Source would be shifted to EPAC, per the MSA. On July 6, 2010, at Thomas Nelson's request, EPAC signed the MSA. After EPAC signed the MSA, Thomas Nelson continued to discuss pricing with Lightning Source. Lightning Source even submitted offers to reduce its pricing. Thomas Nelson finally executed the MSA on July 16, 2010. And then in November, Thomas Nelson signed a contract with Lightning Source. Again, EPAC knew that Thomas Nelson was still working with Lightning Source for at least some purposes.

Thomas Nelson began ordering books from EPAC, and the parties ran into trouble from the start. Thomas Nelson constantly complained about the quality, saying there was scuffing, chipping, and out-of-square edges. In February 2011, Thomas Nelson sent a formal notice of breach to EPAC, describing the ongoing quality issues and invoking the MSA's 60-day cure period. Right before the end of the cure period, Thomas Nelson said "the quality seemed to be good." EPAC indicated it would be best for the parties to revisit the contract, especially taking a look at the volume terms. The parties never revised the MSA, and in April 2011, Thomas Nelson terminated the MSA.

## II. PROCEDURAL HISTORY

EPAC filed its first complaint against Thomas Nelson in May 2012, alleging breach of contract (including breach of the CNDA and the MSA), breach of the implied covenant of good faith and fair dealing, unfair competition under California Business and Professional Code § 17200 et seq., promissory fraud, fraudulent concealment, unfair and deceptive acts under the Tennessee Consumer Protection Act, and negligence per se.

At the summary judgment stage, all but four claims were resolved. One issue in this appeal concerns the district court's grant of summary judgment for Thomas Nelson on the promissory fraud claim. As the basis for this claim, EPAC alleged that Thomas Nelson, by contracting with Lightning Source in addition to EPAC, knew that it would not perform under the contract but entered into the agreement with EPAC anyway. The district court found that New York law applied and foreclosed a claim of promissory fraud when there was also a breach of contract claim. EPAC challenges this ruling on appeal.

The remaining claims went to trial: breach of the CNDA;[1] breach of the MSA; and fraudulent concealment. At the close of EPAC's case-in-chief, Thomas Nelson moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on all the claims. The court granted Thomas Nelson's motions as to the breach of the CNDA. EPAC alleged that Thomas Nelson breached the CNDA when it disclosed the pricing terms and delivery terms they were discussing to Lightning Source. However, the district court found that if any breach occurred, it occurred outside of the one-year time limit specified. The district court took under advisement, and then eventually denied, Thomas Nelson's motion with respect to the fraudulent concealment

---

[1] The district court stated that two claims, one for a breach of the CNDA and one for a breach of "a separate Non-Disclosure Agreement" went to trial. But the district court analyzed only the breach of the CNDA, which contains two provisions (Section 3 and Section 6) governing various non-disclosure mandates. Moreover, the parties make clear that there is only one confidentiality and non-disclosure agreement that is at issue and in evidence in this case.

claim. For that claim, EPAC alleged Thomas Nelson concealed the fact it was negotiating with Lightning Source to obtain lower pricing for orders it was required to send to EPAC. The district court also denied Thomas Nelson's motion with respect to the breach of the MSA claim, in which EPAC argued Thomas Nelson breached the MSA by terminating the agreement after just one year. Thomas Nelson renewed its motion at the close of its own case, but the district court declined to revisit the issues.

Those two claims—fraudulent concealment and breach of the MSA—went to the jury. And the jury returned a verdict for EPAC on both claims, awarding $3 million in compensatory damages for the breach of the MSA claim, as well as $60,000 in compensatory damages and $12 million in punitive damages for the fraudulent concealment claim. Thomas Nelson renewed its motion for judgment as a matter of law and, alternatively, moved for a new trial. The district court denied Thomas Nelson's motion as to the breach of the MSA claim, letting the jury verdict and damages award stand. The district court granted Thomas Nelson's motion as to the fraudulent concealment claim, finding that Thomas Nelson did not have a duty to disclose, which is necessary to maintain a fraudulent concealment claim.

EPAC appealed, challenging the district court's (a) grant of Thomas Nelson's Rule 50(b) motion for judgment notwithstanding the verdict for the fraudulent concealment claim; (b) grant of summary judgment on the promissory fraud claim, and (c) judgment as a matter of law on the breach of the CNDA claim. Thomas Nelson cross appealed, arguing it is (a) entitled to reduced damages or a new trial for the breach of the MSA claim and (b) entitled to attorneys' fees for the breach of the CNDA claim.

## III. ANALYSIS

### A. Fraudulent Concealment Claim

EPAC alleged that Thomas Nelson had a duty to disclose "that it had fraudulently obtained new pricing or otherwise improved terms for the same services from another vendor." The jury agreed and returned a verdict in favor of EPAC, but the district court found otherwise, holding that there was no duty to disclose because EPAC and Thomas Nelson were simply negotiating at arm's-length—a fact that forecloses a fraudulent concealment claim. EPAC appeals this finding, arguing numerous errors. Chief among these are that the district court applied the wrong law, erroneously treated the question as one of law, and consequently applied the wrong standard of review. While the district court's analysis was less than perfect, the ultimate conclusion reached is correct and we can affirm on different grounds. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).

#### 1. Applicable Law

We review the district court's application of law de novo. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). In Tennessee, the "tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (citing *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998)). The duty to disclose arises in three circumstances: (1) where there is a previous fiduciary relation; (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other; and (3) when the contract or transaction is intrinsically fiduciary. *Id.* (citing *Domestic Sewing Mach. Co. v. Jackson,* 83 Tenn. 418, 425 (1885)). Only the second type of relationship—one of trust and

confidence—is at issue here. Our circuit has made clear that "Tennessee law defines a confidential relationship as one created when confidence is placed by one on the other and the recipient of that confidence is the dominant personality with the ability because of that confidence to influence and exercise dominion over the weaker or dominated party." *Id.* (citation and quotation marks omitted). Whether there is a requirement that one party exercise dominion and influence over the other is at the heart of the parties' arguments.

We have consistently held there is a requirement of dominion and influence. *See Shah*, 338 F.3d at 571; *McGuirk Oil Co. v. Amoco Oil Co.*, 889 F.2d 734, 737–38 (6th Cir. 1989); *Edwards v. Travelers Ins. of Hartford*, 563 F.2d 105, 115 (6th Cir. 1977). And there's no clear indication from the Tennessee courts that *Shah*, *Edwards*, and *McGuirk* were wrongly decided—which could warrant reconsidering those decisions. *See Blaine Const. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 350 (6th Cir. 1999) (noting that a panel cannot reconsider a binding decision "absent an indication by the Tennessee courts that they would have decided" the case differently).

Despite this clear precedent, EPAC challenges the district court's legal analysis on two grounds. First, even if dominion and influence is a requirement, it is limited to equitable contexts. And second, Tennessee recognizes an alternative way to find a duty to disclose, which does not require a showing of a relationship of trust and confidence. Both arguments fail.

First, the requirement of dominion and influence is not limited to equitable contexts to determine whether undue influence is present. *See Condo. Mgmt. Assocs. v. Fairway Vill. Owner's Ass'n*, No. W2009-00688-COA-R3-CV, 2010 WL 424592, at *8 (Tenn. Ct. App. Feb. 8, 2010); *Foster Bus. Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *13 (Tenn. Ct. App. Jan. 15, 2009).

Second, EPAC is wrong to argue that the jury instructions should have included an alternative ground for finding a duty to disclose:  that a party to a contract may have a duty to disclose (so there need not be a showing of a relationship of trust and confidence).

According to EPAC, Tennessee courts have adopted the Restatement (Second) of Torts § 551, which establishes that "each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it."  *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947) (quoting *Perkins v. McGavock*, 3 Tenn. 415, 417 (Tenn. 1813)); *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 196 (Tenn. Ct. App. 2010). This is known as the "*Simmons* rule."  But again, we are bound by our precedent that says the *Simmons* rule wouldn't apply here—absent a clear indication from the Tennessee Supreme Court that we were previously wrong.

In *Shah* (in 2003), we found the *Simmons* rule limited to real estate purchases and car sales and we "decline[d] to anticipate that the Tennessee Supreme Court would extend the *Simmons*" cases to the context of a franchise (or similar) dispute.  *Shah*, 338 F.3d at 572 n.9.  And this remains true.  *See Stanfill v. Mountain*, 301 S.W.3d 179, 185 (Tenn. 2009) (involving real property); *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) (same).

EPAC cites to *Bearden v. Honeywell Int'l Inc.*, which found that "since *Shah* was decided in 2003, Tennessee courts have repeatedly applied *Simmons* in contexts other than car and real estate sales." 720 F. Supp. 2d 932, 940 (M.D. Tenn. 2010).  True, to an extent.  Since *Shah*, district courts have recognized Tennessee law surrounding fraudulent concealment is somewhat unsettled. *See id.* at 939–41; *Myers v. Peoples Bank of Ewing*, No. 3:11-CV-380, 2012 WL 3288179, at *5 (E.D. Tenn. Aug. 10, 2012).

But the law is not as unsettled as EPAC makes it out to be and it certainly is not "clear" that the Tennessee Supreme Court would extend the *Simmons* rule to EPAC's claim here. Tennessee courts still apply the *Simmons* rule only to sales of physical property or to disputes tangentially related to real estate (like construction disputes). *See, e.g.*, *Classic City Mech., Inc. v. Potter S. E., LLC*, No. E2015-01890-COA-R3-CV, 2016 WL 5956616, at *14–15 (Tenn. Ct. App. Oct. 14, 2016); *Case Handyman Serv. of Tenn., LLC v. Lee*, No. M2011-00751-COA-R3-CV, 2012 WL 2150857, at *1, 7 (Tenn. Ct. App. June 13, 2012); *Robert J. Denley Co., Inc. v. Neal Smith Const. Co., Inc.*, No. W2006-00629-COA-R3-CV, 2007 WL 1153121, at *1, 6 (Tenn. Ct. App. Apr. 19, 2007).

EPAC cites to only one case, *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, where a Tennessee court applied the *Simmons* rule to a licensing agreement dispute. 330 S.W.3d 166, 196 (Tenn. Ct. App. 2010). But *GuestHouse* is the outlier, and we can't anticipate Tennessee will expand the *Simmons* rule to service agreements based on one outlier. Moreover, *GuestHouse* related to a sale of service marks for a motel business—sales tangentially related to real estate. *Id.* at 169. And this even fits the limited scope to which the *Simmons* rule is applied.

The district court therefore applied Tennessee law correctly when it found that a duty to disclose requires a showing of dominion and influence and refused to instruct the jury on the *Simmons* rule.

### 2. Standard of Review Under Tennessee Law

Apart from applying the correct law for a claim of fraudulent concealment, the district court's analysis of Thomas Nelson's Rule 50(b) motion is flawed. Yet even so, the end result does not change. We also find there was no duty to disclose. *See Abercrombie & Fitch Stores, Inc.*, 280 F.3d at 629 (noting court of appeals can affirm on different grounds supported by the record).

To review a motion under Rule 50(b), "[a] federal court exercising its diversity jurisdiction applies the law of the state whose substantive law governs the action to determine whether to grant or deny a motion for judgment as a matter of law based on insufficiency of the evidence." *Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005) (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998)). However, legal determinations (even in diversity cases) are always reviewed de novo. *Zurich Ins. Co.*, 97 F.3d at 176. The Tennessee standard of review provides:

> In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the nonmovant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence.

*State Indus., Inc. v. Twin City Fire Ins. Co.*, 158 F. App'x 694, 696 (6th Cir. 2005) (citing *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995)).

As an initial matter, the question of whether a confidential relationship exists, giving rise to a duty to disclose, is a question of fact. *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995) ("[T]he issue of whether or not a confidential relationship existed, if not admitted, was a question of fact.") (emphasis removed); *Condo. Mgmt. Assocs.*, 2010 WL 424592, at \*8; *see also U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

The district court mistakenly applied the federal standard of review for a motion under Rule 50(b). Whether the Tennessee and federal standards differ is beside the point. It's clear the district court didn't view the evidence in the light most favorable to EPAC. Instead, it analyzed all the evidence that shows an arm's length transaction (arguably, all the evidence that favors

Thomas Nelson's theory of the claim), not EPAC's material evidence presented to show something more than an arm's length transaction.

Tennessee law requires us to take all of *EPAC's* material facts that show dominion and control. *See In re Estate of Blackburn*, 253 S.W.3d 603, 613 (Tenn. Ct. App. 2007). And when reviewing a Rule 50(b) motion, we cannot weigh evidence or stand as the thirteenth juror. *Mairose v. Fed. Exp. Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001). But what if there is a complete lack of evidence? Then the answer is clear. *See Harrogate Corp. v. Sys. Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995); *Handley v. May*, 588 S.W.2d 772, 777 (Tenn. Ct. App. 1979). There is no material evidence in the record that shows Thomas Nelson was in a position to exercise influence and control over EPAC. Therefore, there's no duty to disclose.

EPAC challenges this conclusion on multiple grounds. First, EPAC argues that the district court can't even consider "dominion and control" in analyzing Thomas Nelson's Rule 50(b) post-verdict motion. EPAC argues that if a showing of dominion and influence is required, then EPAC is entitled to a new trial because the jury was erroneously instructed. We usually analyze whether a new trial is warranted based on an erroneous jury instruction by asking if that jury instruction was "prejudicial." *Miami Valley Fair Housing Cent., Inc. v. Connor Grp.*, 725 F.3d 571, 580 (6th Cir. 2013). It's hard to see how a jury instructed on an arguably lower standard that resulted in a favorable decision to EPAC somehow prejudiced EPAC. To grant a new trial, the real question is whether there is any material dispute as to the issue of dominion and influence—and here there is no material dispute—therefore, a new trial is not warranted.

Next, EPAC argues (in its reply brief only) that Thomas Nelson waived the ability to include "exercise of dominion and influence" as a requirement because it never raised that argument in its Rule 50(a) pre-verdict motion. Thomas Nelson's first Rule 50(a) motion was

specific enough, in that it argued there was no duty to disclose and even argued more specifically that there wasn't a relationship of trust and confidence. Either way, the whole point of a Rule 50(a) motion is to provide notice to the nonmoving party of the arguments raised against it. *See Bach v. First Union Nat. Bank*, 149 F. App'x 354, 360 (6th Cir. 2005). And EPAC never argues it lacked notice of the dominion and influence requirement. EPAC likely did have notice of the more granular issues of what constitutes a relationship of trust and confidence: dominion and influence is wrapped up in the very definition of a relationship of trust and confidence. Indeed, EPAC doesn't say what further evidence it would have presented to show dominion and influence—in its reply brief it cites to evidence already presented.

Finally (again, in its reply brief only), EPAC argues that there is evidence that shows dominion and influence. To support this assertion, EPAC largely relies on two pieces of evidence: one, that Thomas Nelson "directed" EPAC to open a new print facility and two, that Thomas Nelson had confidential information about EPAC's business that it could use against EPAC. Apart from the fact EPAC likely waived this argument by raising it for the first time in its reply brief, this evidence is not material evidence that shows dominion and influence. *Cf. A & B Food Servs. Corp. v. Judy's Foods, Inc.*, 798 F.2d 468 (6th Cir. 1986) (per curiam) (table); *Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105, 115 (6th Cir. 1977). Duty to disclose under Tennessee law occurs where "confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party . . . ." *Edwards*, 563 F.2d at 115. Reasonable minds wouldn't differ—EPAC's purported evidence doesn't show dominion and influence. With a complete lack of evidence, there is only one conclusion: there was no duty to disclose.

### B. Promissory Fraud Claim

EPAC argues the district court erred in dismissing EPAC's promissory fraud claim at the summary judgment stage. EPAC's promissory fraud claim alleged that Thomas Nelson "promised that it would provide all of its requirements of the specified ranges or printing to EPAC" but in reality, Thomas Nelson "had already obtained lower pricing from [Lightning Source]" and it "had no intention to perform under the Requirements Contract." According to EPAC, the district court erroneously applied New York law to the claim, arguing instead that Tennessee law applies. Not so. The district court correctly applied New York law.

We review choice-of-law questions de novo, *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002), as well as a district court's grant of summary judgment, *GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). Two choice-of-law levels govern this dispute. First, federal courts apply the forum state's choice-of-law provisions to state law claims, *Performance Contracting, Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014), which is Tennessee. Second, we turn to Tennessee law to see what state law governs EPAC's promissory fraud (tort) claim.

This issue boils down to whether the choice-of-law provision in the MSA encompasses EPAC's promissory fraud claim:

> This Agreement will be governed by and construed in accordance with the laws of the State of New York as applicable to agreements entered into and to be performed entirely within that state by residents thereof. Any dispute arising under this Agreement, if brought by Customer, shall be resolved exclusively in the state and federal courts of New York, New York; and, if brought by EPAC shall be resolved exclusively in the state and federal courts of Nashville, Tennessee.

Because the parties executed the agreement in Tennessee, we turn to Tennessee contract law to interpret the choice-of-law provision. *Town of Smyrna, Tenn. v. Mun. Gas Auth. of Georgia*, 723 F.3d 640, 646 (6th Cir. 2013). Tennessee will honor a choice-of-law provision "so long as

the provision was executed in good faith, there is a material connection between the law and the transaction, and the chosen law is not contrary to the fundamental policies of Tennessee." *Id.* at 645–46. Tennessee is apt to construe choice-of-law provisions broadly. *See Frizzell Const. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). And there's no indication from a Tennessee court that the language in the choice-of-law provision above does not contain related tort claims. Persuasively, our circuit has already found that a nearly identical contract provision encompasses related tort claims. *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993); *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1139–40 (6th Cir. 1991) (finding "governed by" language is the key phrase that encompasses tort claims). Accordingly, the choice-of-law provision here applies to EPAC's promissory fraud claim because the promissory fraud claim "put[s] the validity of the contract in issue, and such a claim would appear to be encompassed by the language." *Moses*, 929 F.2d at 1140.

Therefore, New York law applies and bars EPAC's promissory estoppel claim. Under New York law, a claim based on promissory fraud is barred if (1) the legal duty to perform under the contract is the same; (2) the fraudulent misrepresentation is not collateral or extraneous to the contract; and (3) the damages for this claim are the same under the contract. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)). All of this is true here, and EPAC doesn't dispute this.

Rather, EPAC argues New York law can't apply because there are no material connections between New York and the transaction, and, in any event, New York law offends fundamental policies of Tennessee law. *See Town of Smyrna*, 723 F.3d at 645–46. Not so.

First, there are material connections between the transaction at issue and New York. EPAC argued as much earlier on in the case. EPAC's President and CEO who signed the MSA was based

in EPAC's New York office and negotiated the terms of the contract from New York. Thomas Nelson continued to have discussions with EPAC's CEO, based in New York. Further, communications with an EPAC officer (based in New York) continued even after the termination of the MSA. This is enough to establish a material connection to New York. *Cf. Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 418–19 (6th Cir. 2006) (finding no material connection to Delaware where no work was performed in Delaware and where there was no Delaware office).

Second, applying New York law here does not offend a fundamental policy of Tennessee. Under Tennessee law, a fundamental policy is something that implicates "public health, safety, or welfare." *Franklin v. Swift Transp. Co., Inc.*, 210 S.W.3d 521, 529 (Tenn. Ct. App. 2006) (quoting *Guy v. Mut. Of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002)). Or it concerns an activity that is "in violation of the criminal or civil code of" Tennessee. *Sanders v. Henry Cty.*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *8 (Tenn. Ct. App. Apr. 21, 2009) (quoting Tenn. Code Ann. § 50-1-304((a)(3) (2008)). No Tennessee fundamental policy is offended simply because New York law bars a promissory fraud claim, and Tennessee law may allow it. *See Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 694 F. Supp. 2d 888, 908 (W.D. Tenn. 2010) (reconsidered on different grounds).

All to say, New York law applies and bars EPAC's promissory fraud claim.

## C. Breach of the CNDA

EPAC argues the district court erred in granting Thomas Nelson's Rule 50(a) motion for judgment as a matter of law on EPAC's claim for breach of the confidentiality agreement. For that claim, EPAC argues that Thomas Nelson breached the CNDA by disclosing pricing and other terms to Lightning Source. The district court found, however, that EPAC's claim failed because the relevant one-year provision in the CNDA expired by the time any alleged disclosure occurred.

On the other hand, EPAC argues the CNDA is ambiguous and could be read to prohibit Thomas Nelson from disclosing information for up to five years, not just one year.

We review de novo the district court's grant of a Rule 50(a) motion for judgment as a matter of law. *Watts v. United Parcel Service, Inc.*, 701 F.3d 188, 190 (6th Cir. 2012). And, as the district court correctly found, the CNDA's one-year term applies, and Thomas Nelson did not breach within one year of the CNDA (if Thomas Nelson even breached at all).

All parties agree Tennessee law governs, as the CNDA provides. And under Tennessee law, courts look first to the "usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Further, "[a]ll provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Id.*

There are two sections of the CNDA that prohibit Thomas Nelson from disclosing certain information. Section 3 of the CNDA, which contains a five-year term, protects "Confidential Information," which is "defined as that Information which a Party hereto desires to protect against disclosure or competitive use and which is designed as such in the manner provided by this Agreement." "Confidential Information" includes "[a]ll non-public information concerning the business, Technology, internal structure and strategies of EPAC or Nelson." Section 6, which contains a one-year term, provides that "the Parties agree not to disclose to any person either the fact that discussions are taking place concerning the Project or any of the terms, conditions or other facts with respect to such Project, including the status thereof . . . for a period of one (1) year from the date hereof." The "Project" is the "potential business transaction." If Section 6 applies, then it's clear Thomas Nelson did not commit any breach within the one-year governing term of Section 6.

In *Guiliano*, the Tennessee Supreme Court said that a contract should be construed to avoid repugnancy between the various provisions. *Guiliano*, 995 S.W.2d at 95. So Section 3 and Section 6 should be read to avoid protecting overlapping information. And a plain reading of the two sections shows those sections protect different information. Section 3 protects the proprietary technology and business information, along with the internal structures of EPAC. Section 6 protects any party from disclosing the fact that "discussions are taking place concerning the Project" (the potential business transaction). The main question is, do all of Thomas Nelson's alleged disclosures fall under discussions concerning the parties' potential business transaction. The answer is yes.

EPAC maintains Thomas Nelson disclosed the following:

- the pricing terms
- "We have to turn orders in by 2:00 pm to receive next day";
- "They also have a four- and seven-day turnaround";
- "The orders range from 1 to 1,500 units";
- "The freight is included in cost";
- "They will ship to us or any location."

These are terms concerning their potential business transaction. This is not information concerning EPAC's business, technology, internal structure, or strategies. Therefore, only the one-year term applies and EPAC cannot show Thomas Nelson breached within one year.

## D. Cross Appeal by Thomas Nelson

Thomas Nelson cross appeals arguing the jury verdict on the breach of the MSA claim should not stand, or at the very least, the damages award should be reduced. Thomas Nelson also appeals the district court's denial of its request for attorneys' fees.

### 1. Challenges to the Breach of the MSA Verdict

Thomas Nelson challenges the jury verdict on the breach of the MSA in three ways. First, the damages amount is too high, given not all orders accounted for in the damages amount were

subject to the contract. Second, EPAC's presentation of evidence on its improper fraudulent concealment claim unfairly prejudiced Thomas Nelson. And third, the district court's adverse inference instructions based on destruction of evidence also prejudiced Thomas Nelson. All challenges fail.

### a. Damages Award for the Breach of the MSA

Thomas Nelson argues EPAC failed to present evidence to support the jury's determination of compensatory damages in the amount of $3 million.

New York substantive law governs the breach of the MSA claim; therefore, we look to New York's standard of review for judgments as a matter of law. Under New York law, a party can recover lost profit damages in a breach of contract claim if it demonstrates the alleged loss with reasonable certainty and the damages were fairly within the contemplation of the parties to the contract at the time it was made. *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993) (citing New York Law).

And "[d]rawing all inferences in the favor of the non-moving party, as we must, the evidence—including but not limited to the expert testimony—sufficed to establish reasonable certainty for the damages awarded." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 972 (9th Cir. 2013) (applying New York law to breach of contract lost profits damages claim). Especially so, since damages need not be determined with absolute certainty. *Myheal Techs., Inc. v. Fonar Corp.*, 100 F.3d 944 (2d Cir. 1996) (table).

The district court found that each side presented its arguments, its experts, and its calculations regarding damages. EPAC's expert presented a figure of $5,598,634 in lost profits. Thomas Nelson's expert found at most the lost profits were $632,549. Thomas Nelson had urged the district court to reduce the damages amount to $2 million at most. The district court found it

could not "reweigh the evidence (expert reports and testimony) and the credibility of" both parties' experts. And the district court found it would be unreasonable to grant Thomas Nelson judgment as a matter of law when the jury verdict of $3 million "lies within a range suggested by both EPAC and Thomas Nelson." The district court didn't err here, given EPAC presented evidence that could support with "reasonable certainty" a damages amount of $3 million and the damages amount lies within the range contemplated by both parties. *Trademark Research Corp.*, 995 F.2d at 332.

### b. Unfair Prejudice from Fraudulent Concealment Claim Evidence

Thomas Nelson argues that EPAC's presentation of its "non-viable" fraud claim unfairly prejudiced Thomas Nelson, and so Thomas Nelson moved for a new trial on the breach of contract claim. We review a district court's denial of a new trial motion for abuse of discretion. *Pittington v. Great Smoky Mt. Lumberjack Feud, LLC*, 880 F.3d 791, 798–99 (6th Cir. 2018).

The district court found that there was no indication that the jury was inflamed or considered inadmissible parol evidence when resolving the breach of contract issue. The district court gave a limiting instruction, telling the jury that it "may consider any such evidence only for the purpose for which it was admitted[.]" And the district court correctly noted that "[f]ederal courts generally presume the jury will follow the instructions correctly as given." *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 822 (6th Cir. 2000). Without any indication in the record that the jury was "inflamed" or improperly swayed, *Hinds v. Titan Wheel Int'l, Inc.*, 45 F. App'x 490, 496 (6th Cir. 2002) (per curiam), we conclude that the district court didn't abuse its discretion in denying a motion for a new trial on these grounds.

### c. Adverse Inference Instructions

Thomas Nelson argues it is entitled to a new trial because it was unfairly prejudiced by two adverse inference instructions given to the jury—one relating to damaged books, the other to electronic warehouse data:

- **Books.** Thomas Nelson had a duty to preserve evidence relevant to this litigation; it breached that duty by negligently allowing the books in its control to be sold, lost, or destroyed; and you may infer that, if available, the books would support EPAC's claims and be adverse to Thomas Nelson.
- **"Warehouse" Data.** Thomas Nelson also had a duty to preserve its warehouse data as of April 18, 2011, and negligently failed to do so. Such data, now lost, may have shown whether EPAC-printed books were sold or returned, whether Thomas Nelson received customer complaints about EPAC-printed books, the quantity and timeliness of EPAC's order fulfillment, and from what EPAC facility the books were shipped. You may give this whatever weight you deem appropriate as you consider all of the evidence presented at trial.

As way of background, Thomas Nelson allegedly failed to preserve any damaged books, customer complaints, or electronic warehouse data, despite knowing of its duty to preserve as early as April 2011 (when EPAC sent a letter to Thomas Nelson telling it to preserve all relevant evidence).

District courts have broad discretion to craft sanctions for spoliated evidence, *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009), and we review a district court's decision to give an adverse inference instruction for abuse of discretion. *Ross v. Am. Red Cross*, 567 F. App'x 296, 301 (6th Cir. 2014); *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013). *But see West v. Tyson Foods, Inc.*, 374 F. App'x 624, 635 (6th Cir. 2010) (propriety of jury instruction is reviewed de novo but noting *Adkins* rule that federal courts have broad discretion in crafting proper sanction for spoliation). The district court didn't err in issuing the above two jury instructions.

First off, the instructions above are merely permissible, telling the jury what they "may" infer. The fact that Thomas Nelson was only "negligent" does not defeat the instructions. Only

mandatory adverse instructions require a culpable state of mind in the destruction of evidence. *See generally Flagg*, 715 F.3d at 178. Second, both instructions were no greater than necessary because they were only permissive in nature. *Tyson Foods, Inc.*, 374 F. App'x at 635 ("The jury instruction the district court gave here was merely a permissive one, allowing, but not requiring, the jury to draw a negative inference."); Fed. R. Civ. P. 37(e)(1) (for failure to preserve electronic evidence, district court "may order measures no greater than necessary to cure the prejudice"). Giving broad discretion to the district court and even reviewing the propriety of the instructions de novo, we find that Thomas Nelson's claim for a new trial based on these instructions fails.

### 2. Claim for Attorneys' Fees

Thomas Nelson moved for attorneys' fees as the winning party for the breach of the CNDA claim. The district court denied that request. The CNDA provides for attorneys' fees, and states in relevant part:

> In the event [an] action or proceedings are instituted to enforce or interpret the obligations of the Parties to this Agreement, the prevailing Party will be entitled to recover from the other Party all reasonable attorneys' fees and attendant costs and expenses for the action or proceeding.

The district court denied Thomas Nelson's request, finding Thomas Nelson could not identify and segregate discrete activity or costs related specifically to the CNDA claim. Thomas Nelson argues the district court is required to award *some* of the attorneys' fees and its decision to deny any fees at all is wrong as a matter of law. Any contractual interpretations, like interpreting who is the "prevailing party" under the CNDA, we review de novo. *Gerken Paving, Inc. v. La Salle Grp., Inc.*, 558 F. App'x 510, 516 (6th Cir. 2014). The magnitude of attorneys' fees (or whether they were granted or not), we review for abuse of discretion. *Id.*

Like the district court, we need not decide whether Thomas Nelson was the prevailing party on the CNDA claim because we too find that Thomas Nelson failed to meet its burden of proving

reasonable fees. True, a prevailing party is entitled to reasonable attorneys' fees under a contract that explicitly provides for such fees. *Monroe v. Zierden*, No. W2007-01818-COA-R3-CV, 2008 WL 4253850, at *2 (Tenn. Ct. App. Sept. 17, 2008). But a party is entitled to only the fees spent defending (or pursuing) that particular claim. *See Furnco, LLC v. Laneventure, Inc.*, No. 07-2333, 2010 WL 11598119, at *3 (W.D. Tenn. Oct. 5, 2010); *Williams v. Williams*, No. M2013-01910-COA-R3-CV, 2015 WL 412985, at *14 (Tenn. Ct. App. Jan. 30, 2015). And, crucially, a prevailing party "has the burden to make out a *prima facie* case for [its] request for reasonable attorney's fees." *Monroe*, 2008 WL 4253850, at *2 (citing *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988)).

For proof of its "reasonable" request, Thomas Nelson offered almost all fees from the time EPAC amended its complaint to include the CNDA claim to the time the CNDA claim was dismissed, disregarding the fact it was defending against all of EPAC's other claims as well. Thomas Nelson excluded only fees during that time related to pursuing its counterclaims and fees incurred for additional privilege logging. Thomas Nelson's documentation of fees submitted to the district court totaled over 500 pages and the fees totaled over $4 million, an amount certainly not reasonable for defending just the CNDA claim. Not only did Thomas Nelson fail to attempt to separate the fees for the breach of the CNDA claim, Thomas Nelson claimed it was "not possible" to separate the fees because of EPAC's trial strategy and so it was therefore entitled to all $4 million in fees. Thomas Nelson, in a complete reversal of its earlier position before the district court, now argues the district court erred in failing to grant a portion of the fees—an argument Thomas Nelson has likely waived. But, regardless, a party that fails to separate out its fees so that a court can sufficiently determine reasonable fees has not met its burden of proof.

*Furnco*, 2010 WL 11598119, at \*2–3 (citing *Wilson Mgmt. Co.*, 745 S.W.2d at 873).  The district court therefore did not err in denying Thomas Nelson's motion for attorneys' fees.

## IV. CONCLUSION

For these reasons, we affirm.